This suit was brought by the appellee W.H. Mackney against the Fort Worth Denver City Railway Company for damages.
The grounds of the suit are, that while plaintiff was in the discharge of his duty as fireman on a locomotive of the Gulf, Colorado Santa Fe Railway Company at Saginaw Station, where the two railways cross, one of defendant's engines and trains, by the negligence of the operatives in charge of the same, ran upon and collided with the locomotive plaintiff was on, without fault on his part, and injured him seriously and permanently. The petition describes the injuries. It is alleged that defendant's servants in charge of its train failed to stop upon approaching the crossing, failed to give signals of their approach, and failed to keep proper lookout for the crossing, and thereby caused the collision.
The special answer of defendant set up contributory negligence on the part of the plaintiff; that he failed to keep a lookout for and give warning of the approach of defendant's train, as was his duty to do; and his failure to do so caused the collision. It is stated that the defendant's train reached the crossing before the other train, had a clear right of way, had stopped and whistled for the crossing, and after it *Page 413 
had stopped and started forward it was run into by the other train by the negligence of plaintiff and his coemployes. It is also stated as a defense, that one Johnson, a coemploye and fellow servant of plaintiff, was engineer on the Santa Fe train, and he failed to stop on approaching the the crossing, and recklessly ran his train into defendant's with full knowledge that defendant's train, under the rules, was entitled to the track; that the negligence of Johnson was the direct and proximate cause of the injury to plaintiff.
There was a verdict and judgment for plaintiff for $5000. Defendant appealed, and assigns errors.
The evidence was conflicting, that for plaintiff showing that the signals were duly given on the Gulf, Colorado Santa Fe passenger train for the crossing; that the train came to a full stop at the stop post before reaching the crossing, and moved up to the crossing first, the locomotive being on the crossing when the defendant's freight train struck, knocking the locomotive of the Santa Fe off the crossing. For the defendant, on the other hand, the evidence showed, that its train arrived and stopped first, gave the proper signals, and then moved up to the crossing where the collision occurred. "The Fort Worth Denver engine struck the Santa Fe engine and turned her over and stood on a portion of the Santa Fe engine tank, mashing both engines and tanks, turning over one stock car, and killing about eleven head of cattle" on the freight train.
It is claimed by appellant that the following portion of the court's charge is erroneous, because it is upon the weight of evidence: "You are instructed, that if you believe from the evidence that the engineer operating the engine of the Fort Worth Denver City Railway Company, mentioned by the witnesses, failed on approaching the crossing of the Gulf, Colorado Santa Fe Railway Company to bring his engine to a full stop before reaching the crossing, at such distance therefrom as under the circumstances common prudence would dictate as necessary to avoid colliding with the train on the track of the Gulf, Colorado Santa Fe Railway Company, and that by reason of such failure to stop within such distance the collision occurred, the defendant would be negligent and liable to the plaintiff for any injury that he may have sustained on account of the negligence."
It is insisted that the charge of the court is on the weight of evidence, because it informs the jury that certain facts stated would amount to negligence — that is, if defendant did not "bring its engine to a full stop before reaching the crossing at such distance therefrom as under the circumstances common prudence would dictate as necessary to avoid colliding," etc., defendant would be negligent. The argument in favor of this position is, that the statute requiring an engine approaching a crossing of the railways to be brought to a full stop does not prescribe where the stop shall be made. The statute merely says, *Page 414 
that in such case the engine shall "be brought to a full stop." Rev. Stats., art. 4232. The statute being silent upon the subject, it was necessary for the court to tell the jury where the stop should be made, not at any given distance but where common prudence would dictate it should be made to avoid a collision on the crossing. It was not error to instruct the jury that such failure would be negligence, because the want of necessary care would be negligence. This was submitted. The court carefully guarded the effect of the charge in creating no liability on account of such negligence unless it caused the collision. The charge was an admirable one, and could not well be improved.
The next assignment of error complains of the following charge of the court: "If you believe from the evidence that the engineer in charge of said engine of the Fort Worth Denver City Railway Company did stop his engine within the proper distance of said crossing as above indicated, but if you believe from the evidence that said engineer after having stopped his engine started said engine toward the crossing, and that when he did so he knew that the train of the Gulf, Colorado Santa Fe Railway Company was approaching said crossing, and that the situation was such as to indicate to a man of ordinary prudence occupying the position in which said engineer was at the time, to proceed across said crossing would probably and in the ordinary course of events result in a collision with the train of the Gulf, Colorado Santa Fe Railway Company, * * * the defendant would be negligent and liable to plaintiff for any injury plaintiff may have sustained by reason of said collision."
The objection to this part of the charge is, that there was no evidence in the case indicating that the engineer of the Fort Worth Denver City Railway Company saw the train of the other road after he stopped his engine and before starting, and that there were no facts in evidence which made such a hypothesis necessary. It was a dark night when the collision occurred; it was open prairie around Saginaw, and the headlights of each of the approaching trains were visible to each other for a mile and more, and on this occasion were seen by operatives of each of the trains sometime before reaching the station.
The conductor of the defendant's train testified, that the speed of his train at the time of collision was four to six miles an hour. "We stopped three or four hundred feet from the crossing. The speed of the train was about four miles an hour at the time of the collision. I saw the Santa Fe train between a quarter and half mile before the accident. * * * I could and did see the train on the Santa Fe without making any effort, more than simply looking. * * * When I started to cross the track the Santa Fe train (passenger) was in sight about between one-quarter and one-half of a mile down the track. In my judgment, at the time I started to run over the crossing there was not a chance for a collision of the two trains. The Santa Fe train *Page 415 
blew a signal whistle for the station at Saginaw about a quarter of a mile before reaching the crossing. I can not say whether the train stopped before reaching the crossing or not. The Santa Fe train was moving over the crossing at the time of the collision."
The engineer of the defendant's train testified: "My train was composed of sixteen cars of cattle. We stopped for the crossing about nine car lengths from the crossing. We whistled 'off brakes,' as the crossing was clear and no train in sight at the time. I got my train under headway, and after I got so near to the crossing that I could not stop again I saw the train coming up on the other road. I supposed it was a freight train and that it would stop, but when it came closer I saw that it was a passenger. I then thought it would stop up close to the crossing and the depot. I could not have stopped my train before getting on the crossing, as it was down grade and I was running about three or four miles an hour. They did not stop at all that I could see. When they got behind the depot I whistled a second time to let them know there was a train on the track, but they did not stop. When I stopped for the crossing I can not say how far the Santa Fe train was from the crossing, because I could not see them. When I first saw them it was too late for me to stop. They were pulling up to the depot at the time. I stopped, and started again to make the crossing, because when I stopped and whistled I could see no train on the other road. When I first saw the Santa Fe train it was near the whistling post. I had a right to the crossing, because I stopped and whistled and the crossing was clear. The other train did not stop that I know of. The night was dark and misting rain. My headlight could have been seen on that night if there was no obstruction for at least a mile and a half. I could have stopped my train under all the conditions that existed at the time in about six or eight car lengths if I had known they were not going to stop for the crossing. I was within one car length of the crossing when I first discovered there was to be a collision. I did not have time to stop my engine. I tried to reverse her, but did not have time. I had to jump off to keep from being killed. The Fort Worth Denver engine struck the Santa Fe engine," etc.
Becker, who was at the depot that night, testified, that the Santa Fe train came down, whistled, and ran on the crossing. "I saw the Santa Fe train that night. When I first saw it (a half-mile out) the Fort Worth Denver train was about 500 or 600 feet from the crossing. It came down first from the west, and pulled within 500 or 600 feet of the crossing, stopped and whistled, and then came on."
One Glenn, who was at the time of the collision mail agent on the Santa Fe train, testified: "I was standing in the door of the mail car nearly all the way from the St. Louis, Arkansas 
Texas crossing, north of Fort Worth, until we got to Saginaw. I saw the train of the Fort *Page 416 
Worth Denver as far as a train could be seen across the prairie; saw the headlight. Our train was going north and that train was coming south — both coming to the crossing. We went on and got to Saginaw, and the engineer as usual blew for the station, and then stopped and gave two signals for the crossing of the Fort Worth Denver at Saginaw. At that time the Fort Worth Denver had not stopped. It was coming ahead, and if it ever stopped it must have stopped away out of sight across the prairie as far as I could see. The Santa Fe blew two signals for the crossing and then pulled up to the station. That left the engine about on the crossing. I was standing in the door paring my finger nails with my knife. I was on the left-hand side going north, and while we were standing I dropped my knife out of my hand and stuck it in the platform of the station at Saginaw, and while the train was standing I got out and got it, and spoke to the brakeman who was on the front of the first passenger coach, and I then got on and our train pulled up. This train on the Fort Worth Denver coming down still never had stopped that we saw, and it never whistled until, just before they came together, they gave two blasts, a signal for danger, or something like that. The Denver train was in motion when the collision occurred. It hadn't stopped at all. The Santa Fe was on the crossing, but the Denver never stopped at all until they met us; at least if they did it was miles away, before we saw them. I was looking at it."
This witness on cross-examination was not certain whether the Santa Fe train had entirely stopped when the collision occurred, or whether the collision had stopped it.
There is other testimony of the same character, more or less to the point. It is useless to analyze it. The jury were not compelled to believe the statement of the engineer, that he did not see the Santa Fe train in time to stop. Others saw it, and the circumstances raise the question as to whether he saw it. Indeed, the facts stated by him may have appeared to the jury as inconsistent with his simple statement that he did not see it in time to stop. There was such an issue as that presented to the jury in the charge. It is insisted that this charge is also upon the weight of evidence, stating to the jury what acts or omissions would amount to negligence.
The foregoing is not the full charge or paragraph of the court's charge upon the question. It proceeds without stop as follows: "And if you further believe from the evidence that after it became probable that in the ordinary course of events, if such was the case, a collision would occur, said engineer of the Fort Worth Denver City Railway Company omitted to employ that degree of care that a man of ordinary caution would have exercised under the circumstances to stop his engine before reaching the crossing and avoid the collision, and that by the use of such care he could have stopped his engine and prevented *Page 417 
the collision, or that he failed to exercise that decree of care that a of ordinary prudence would have used under the circumstances in endeavoring to get his engine and train over the crossing in the manner in which he attempted to do, and that by such failure he rendered himself unable by the use of the means at his command to stop his engine and avert the collision, and that the collision resulted from such failure of care and consequent inability to stop, if there was such failure and inability, the defendant would be negligent, and liable to plaintiff for any injury plaintiff may have sustained by reason of said collision."
This charge requires the jury to find all the elements of negligence before they can conclude that there was negligence. The assignment is not well taken.
The next assignment of error is as follows: The court erred in refusing charge number 1 requested by defendant," which is as follows: "The jury are charged, that should they find that the Fort Worth Denver City Railway Company was guilty of negligence at the time of the collision of its said train with the train of the Gulf, Colorado Santa Fe Railway, the plaintiff would still not be entitled to recover if he himself was guilty of any negligence which contributed to or produced the injury. And in this connection you are charged, that if the plaintiff did any act or failed to do anything that would be required of a reasonably prudent man under like circumstances, and if the said act so done by plaintiff or his failure to do anything which would have been required of a reasonably prudent man contributed to or produced the injury which he sustained, he could not recover, and you will find for the defendant. And if you find that it was a portion of the plaintiff's duty as fireman on the train of the Gulf, Colorado Santa Fe Railway Company to keep a lookout in order that his said train might not collide with other trains on other railway lines which crossed the line of the Gulf, Colorado Santa Fe Railway Company, and if you further find that the plaintiff knew of the fact that the said train on which he was fireman was approaching said crossing at Saginaw, and if you further find that reasonable prudence on the part of plaintiff would have required him to keep a lookout and endeavor to discover whether or not there was any train on the track of the Fort Worth 
Denver City Railway Company, and if you find that he failed to keep such lookout, and if you further find that had he kept such lookout he could have discovered such train and avoided the injury, and if you further find that it was negligence on the part of plaintiff to fail to keep such lookout, and that such negligence proximately contributed to any injury which he may have sustained, you are charged that plaintiff can not recover, and your verdict will be for defendant."
The court on this subject instructed the jury as follows: "You are further instructed, that if you believe from the evidence that the plaintiff *Page 418 
knew that the train of the Fort Worth Denver City Railway Company was approaching the crossing at the time that the engine he was on was approaching said crossing, and that he failed to notify the engineer of the engine he was on of the fact that said train of the Fort Worth Denver City Railway Company was approaching the crossing, and request him to stop the engine, or that under the circumstances in which he was placed a person of ordinary prudence would have kept a lookout to ascertain whether there was a train approaching on the track of the Fort Worth Denver City Railway, and that he failed to keep such lookout, in either event plaintiff would be guilty of negligence, and defendant would be entitled to a verdict."
The error relied on in refusing the requested charge is not pointed out, but we are led to believe from the statement in appellant's brief, that the supposed error is the failure of the court to charge upon the plaintiff's duty to keep a lookout while acting as fireman. There was evidence showing that it was plaintiff's duty as fireman to keep a lookout when he had nothing else to do.
The court's charge is more favorable to defendant on this point than the requested charge. The latter authorized the jury to find for defendant if they believed it was the duty of plaintiff to keep a lookout, and that reasonable prudence would have required him to keep a lookout, which he failed to do. The court's charge authorized the jury to find for defendant simply if, under the circumstances in which he was placed, a person of ordinary prudence would have kept a lookout, which he failed to do. The requested charge was more onerous upon defendant in other respects than the court's charge which might be pointed out. Appellant can not complain.
It is urged by appellant, that "the court erred in refusing special charge number 2 requested by defendant." The charge asked and refused is as follows: "You are charged, that under the facts in this case the engineer C.D. Johnson and the plaintiff were fellow servants of the said Gulf, Colorado 
Santa Fe Railway Company, and that under the law one fellow servant can not recover for an injury sustained by reason of the negligence of another fellow servant; and therefore if you find that the engineer Johnson, in charge of the train upon which plaintiff was fireman, failed to bring his train to a full stop at a reasonably safe distance before reaching the crossing, or if you find that he did any other act which caused, either in whole or in part, the injury to the plaintiff, and that said act or thing so done by the said Johnson was negligent, then, in the event you so find, you are charged that the plaintiff would be bound by the negligence of the said Johnson, and you will find in favor of the defendant."
"The court," as stated in appellant's brief, "instructed the jury that the defendant would be liable if its negligence concurred with *Page 419 
the negligence of plaintiff's fellow servant C.D. Johnson in producing the injury."
It has been decided in this State, the opinion by Judge Marr of the Commission of Appeals, that where a servant is injured by the concurrent negligence of the master and a fellow servant the master would be liable. In such case the contributory negligence of the fellow servant is not one of the risks incident to the employment. Railway v. McClain, 80 Tex. 85, and authorities there cited; Beach on Con. Neg., P. 313.
The doctrine is founded on the principle that the injured party may have his action against each joint tort-feasor. Why should not the same principle apply when a stranger stands in the place of the master? It seems to the writer that the reason is much stronger against the stranger. Fellow servants may sue each other for injuries inflicted upon each other in their common employment resulting from personal negligence when an action would not lie against the master. Shearm. Redf. on Neg., p. 112. The servant contracts with the master, and it is for him alone that he assumes the risks of his fellow servant's negligence. Then leaving the master out of view, we have in the case at bar an injury inflicted by the negligence of a fellow servant actionable against him personally and by the concurrent and contributory negligence of a stranger. Are they not joint tort-feasors pure and simple? The master himself would be liable in the place of the stranger, and by a much stronger reason would the stranger be. There is no express or implied contract with the stranger to assume any risks on his account. This is the reasoning employed in the case of Gray v. Railway, 22 American and English Railway Cases, 351. In that case it was distinctly held, that a fireman on a railway injured by a collision at a crossing of two roads, occasioned by the concurring negligence of the engineer on his train and of the employes of the other road, could recover from the other road. See the case and authorities cited. When the plaintiff is free from fault, the negligence of his fellow servant can not be imputed to him for the benefit of a stranger whose wrong contributed to the injury. Where the negligence of the fellow servant is the sole cause of the injury, of course he alone is responsible; but where it concurs with that of a stranger or the stranger's servants, and plaintiff is free from personal negligence, the stranger is liable. This is expressly laid down in Perry v. Lansing, 24 New York (17 Hun), 34. In that case the plaintiff, a pilot of a tugboat, was injured by a collision of the tug with another boat belonging to defendant, by the concurrent negligence of the operatives of both boats. It was held that the plaintiff, being free from fault, could recover of defendant. See the case for authorities and dissenting opinion. Cool. on Torts, 684, and notes 4, 5. We conclude that there was no error in refusing the charge. *Page 420 
The jury after retiring to consider of their verdict came in with the following: "We, the jury, find for plaintiff, and assess damages, actual at $500; exemplary, $4500; total, $5000. [Signed] J.M. Williams, Foreman."
The court refused to accept said verdict, and instructed the jury that under the charge of the court they could not find any exemplary damages against the defendant, and to retire and again consider their verdict.
The jury retired and reconsidered their verdict, and in ten or fifteen minutes returned into court with the following verdict, which was received: "We, the jury, find for plaintiff, and assess damages at $5000. [Signed] J.M. Williams, Foreman."
Exceptions were reserved by defendant to the ruling of the court, and defendant made a motion to have judgment entered upon the first verdict, which was overruled. Judgment was entered upon the last verdict. Error is assigned.
There was no issue except as to actual or compensatory damages in the case, either by pleading or charge. It is not claimed that the verdict is excessive. Plaintiff was severely and permanently injured, was laid up from August to the following April, incurred considerable expense for doctors, nurses, and medicine, and paid $110 for operation on his foot. We think the action of the court was both proper and necessary in all respects.
What the first verdict or what the jury may have styled exemplary damages, was not such. This is evidenced by the last verdict. There was no error in instructing the jury that exemplary damages were not involved, nor in entering judgment in accordance with the verdict received. The statute is conclusive: "If the verdict is not responsive to the issues submitted to the jury, the court shall call their attention thereto and send them back for further deliberation." Rev. Stats., art. 1327.
One ground of the motion for a new trial was, that the presiding judge, the Hon. N.A. Stedman, was of counsel for plaintiff before he became district judge, and was therefore disqualified to try the case. The name of Wynne, McCart 
Stedman, as plaintiff's attorneys, was signed to certain cross-interrogatories filed among the papers of the cause. The bill of exceptions does not affirm that the judge was of counsel, but merely says that the firm name was so signed, and that at the time of filing the interrogatories he was a member of the firm. The judge appended a statement to the bill of exceptions, showing that he was not an attorney in the case and at no time had any connection with it. In answer to the motion for a new trial, Wynne McCart made affidavit, "that Judge Stedman was not of counsel in the case, was never consulted or advised with about it, and that if any of the pleadings or papers in the cause were signed Wynne, McCart Stedman *Page 421 
it was an inadvertence and a mistake, and that he had no interest or connection with it." We suppose from the record that Judge Stedman came into the firm after the old firm of Wynne McCart had been retained in the case. It is clear that he was not and never had been of counsel, and we do not understand that the truth of this is denied by appellant. The bill of exceptions does not affirm that he was of counsel in the case, but that his name, or that of a firm of attorneys of which he was a member at the time of filing, was signed to cross-interrogatories. The affidavit of Wynne McCart sufficiently explains the circumstance, and shows that the judge's name was inadvertently and by mistake signed with the firm name to the document. There is no denial of this, and we take it as true without reference to the unsworn statement of the court, which may not be considered in such a case. Slaven v. Wheeler, 58 Tex. 23. It was the duty of the judge to try the case, and he could not be relieved of this responsibility or recuse himself merely because his name as attorney was improperly signed to one of the papers in the cause, when in fact he was not such attorney.
We find no error in the trial of the cause, and our opinion is the judgment of the court below should be affirmed.
Affirmed.
Adopted February 16, 1892.