GALVESTON, HARRISBURG & SAN ANTONIO RAILWAY COMPANY V.
GEORGE WASHINGTON.

Decided March 24, 1906.

**1.—Improper Argument—New Trial.**

In a personal injury suit against a railroad company, counsel for plaintiff in his closing speech to the jury, without anything in the record to justify such language, denounced the defendant as an octopus, and it and its witnesses as frauds and fakes, and charged a sworn officer of the law with acting as the agent of the defendant, and expressed the belief that one of defendant's witnesses was an ungodly liar. Because the evidence was conflicting, and because it is probable that such inflammatory and vituperative language was prejudicial to defendant, a new trial should have been granted.

**2.—Same—Absence of Exception to Argument.**

Counsel will not be required to except at the time to an improper argument by opposing counsel, nor to request a charge instructing the jury to disregard the same, when the presiding judge had repeatedly stated to the attorneys that he would not sustain an objection to improper arguments to juries in his court, nor instruct the jury to disregard them, and an assignment of error predicated upon such argument will be considered on appeal.

**3.—Case Approved.**

Houston & T. C. Ry. Co. v. Rehm, 11 Texas Ct. Rep., 41, approved, but held not applicable to this case.

Appeal from the District Court of Wharton County. Tried below before Hon. Wells Thompson.

*Baker, Botts, Parker & Garwood, W. S. Brooks, G. G. Kelly* and *C. L. Carter,* for appellant.—It was error for the court to refuse to grant a motion for a new trial where counsel for the plaintiff, in his concluding argument to the jury, goes outside of the record of the case, and abuses and villifies the witnesses of the defendant, and refers to the defendant as an "octopus" and a "vampire," and its claim agents as "tentacles" and "detectives," and makes an argument unsupported by the evidence, of an inflammatory nature, denunciatory in character, where said remarks are not rebuked by the court at the time, and where the court does not charge the jury to disregard same, such remarks and arguments being prejudicial to the rights of the defendant, and calculated to arouse a feeling of passion and prejudice in the minds of the jury against the defendant. Houston & T. C. Ry. v. Rehm, 11 Texas Ct. Rep., 42; Chicago, R. I. & T. Ry. v. Musick, 8 Texas Ct. Rep., 264; Chicago, R. I. & T. Ry. v. Langston, 92 Texas, 709; Hunstock v. Roberts, 65 S. W. Rep., 677; Ft. Worth & D. C. Ry. v. Burton, 60 S. W. Rep., 317; Garrity v. Rankin, 55 S. W. Rep., 368; Missouri, K. & T. Ry. v. Woods, 25 S. W. Rep., 742; Gulf, C. & S. F. Ry. v. Scott, 26 S. W. Rep., 999; Wichita V. M. & Elevator Co. v. Hobbs, 23 S. W. Rep., 923; Gulf, C. & S. F. Ry. v. Butcher, 83 Texas, 314; Dillingham v. Scales, 78 Texas, 206; Moss v. Sanger, 75 Texas, 322; Galveston, H. & H. Ry. v. Cooper, 70 Texas, 69; Gulf, C. & S. F. Ry. v. Duval, 35 S. W. Rep., 699; Texas & St. L. Ry. v. Jarrell, 60 Texas, 270; Texas & Pac. Ry. v. Gracia, 62 Texas, 289; Texas & Pac. Ry. v. Rea, 65 S. W. Rep., 1116; Missouri, K. & T. Ry. v. Huggins, 61 S. W. Rep., 977.

*Jacob C. Baldwin, O. T. Holt, R. M. Brown, J. V. Meek* and *W. L. Hall,* for appellees.—Inasmuch as the appellant failed to except to the remarks of the appellee's counsel at the time they were made, and failed to ask the trial court to charge the jury to disregard the improper remarks, if such they were, the appellant is now estopped from assigning such alleged misconduct of appellee's counsel as error, and such assignment of error can not now be considered by this court.   Tyler Chair Works v. St. Louis & S. W. R. R. Co., 55 S. W. Rep., 354; Gulf, C. & S. F. Ry. Co. v. Brown, 40 S. W. Rep., 613; Jones v. Smith, 21 Texas Civ. App., 440; Moore v. Moore, 73 Texas, 393; Sinclair v. Stanley, 69 Texas, 724; Moore v. Rogers, 84 Texas, 2; Gulf, C. & S. F. Ry. Co. v. Greenlee, 70 Texas, 562; Texas & Pac. Ry. Co. v. Garcia, 62 Texas, 289; Radford v. Lyon, 65 Texas, 472; Western U. Tel. Co. v. Perry, 95 Texas, 645, same case, 30 Texas Civ. App., 245; Bonner v. Glen, 79 Texas, 531; Missouri, K. & T. Ry. Co. v. Follin, 29 Texas Civ. App., 516; Illinois Cent. Ry. Co. v. Cole, 165 Ill., 339; West Chicago Street Ry. Co. v. Annis, 165 Ill., 478; Chicago, St. L. Ry. Co. v. Gillow, 166 Ill., 445; North Chicago R. R. Co. v. Shreve, 171 Ill., 441; Houk v. Branson, 17 Ind. App., 119, 45 N. E. Rep., 78; Welsh v. Brown, 8 Ind. App., 421, 35 N. E. Rep., 921; Enc. of Pl. & Prac., vol. 2, pp. 751 to 757, and authorities there cited.

PLEASANTS, Associate Justice.—George Washington as next friend of his minor son, James Washington, brought this suit to recover damages for personal injuries caused said minor by the alleged negligence of appellant.

James Washington was on the 25th day of March, 1896, run over by a train on defendant's railway in the city of Houston, and his feet and legs were so injured as to require the amputation of both legs below the knee.

The petition alleges that while crossing the public street in the city of Houston the said James Washington stepped upon a rotten plank which the defendant had placed in said street in constructing a crossing over its railroad, and that his foot broke through and became fastened in the hole thus made in said plank, and while so fastened and held upon the track he was run over by a rapidly moving train which was being operated by defendant's employes.

The negligence charged was the failure to keep the crossing in repair, the failure of defendant's employes operating said train to keep a proper lookout for persons on the track, and to observe the ordinances of the city regulating the rate of speed at which trains should be operated within the city and requiring the bell of the engine to be rung while the train was in operation.

The defendant answered by general exception and general denial and by special pleas in which contributory negligence was charged against the said James Washington because of his failure to look and listen before going upon the track and in stepping upon the track in front of the approaching train.

It is further averred that said James Washington at the time he was injured was a trespasser upon defendant's track, and was attempting

to catch hold of and get upon one of defendant's moving cars for the purpose of riding thereon without the consent of the defendant.

Plaintiff's evidence as to the circumstances under which the accident occurred was as follows: James Washington was run over by one of defendant's trains at the intersection of Colorado and Winter Streets in the city of Houston. The track of defendant's railway is along Winter Street. Colorado Street crosses Winter Street at right angles. The boy who was about ten years old at the time of his injury, lived on the south side of Winter Street, five blocks east of the place of the accident, and about 20 feet from the railway track. At the time the accident occurred he was going home from a church service which he had attended at a church situated two blocks south and one-half block east of the place of the accident. His testimony as to the circumstances attending his injury is as follows:

"I was on the southwest side of the intersection of Winter and Colorado Streets, intending to cross from the southwest side to the northeast side, diagonally. I was walking up, and when I got to the corner I looked up a little ways, and I was bound to look in front of me. I never saw any train, and I did not hear any train. I walked like any one else would. I stepped on the track; I just walked on catty-cornered. I stepped on a plank. They got planks inside the track. I was walking along not thinking about anything, and stepped in a hole, and my foot got caught between the rail and a plank. I did not think it was caught hard. I commenced pulling it, and kept on pulling it. It was my right foot. I saw it was kind of hard. I looked behind me and saw a train coming. It was a block and a half from me. I kept on pulling my foot, and the train kept coming. I never heard any bell or any whistle. After the train got close to me, and I saw it would not stop, I fell back away from the track. My right foot was caught. I couldn't get it out. The train kept on coming and then ran over me. They ran over both my feet and they were mashed so bad the doctors had to cut them off. The left leg was split, and the foot was out after the train passed. The train did not stop; it kept on going. My right foot was mashed all around the foot, and my left foot was mashed and my left leg split up to the calf. I had on shoes at the time. After the engine and everything had passed, a fellow by the name of Alfred Nelson came out and grabbed me, and asked me what had happened, and I told him I had my feet mashed. He lifted me up, and another man by the name of Will Underwood ran out, and when he ran out Nelson sent him after a quilt. I never spoke to Underwood, and he did not talk to me. They got a quilt, and put me on it and carried me to Mr. Ed. Hubert's store, right on the corner of Colorado and Winter Streets. That is the corner I was injured on. . . . . The evening I was injured I had been to the church and came along Edwards Street to Colorado Street, and then up to Winter Street."

He further testified that he did not know what kind of engine hit him. Did not know what kind of train. It was pulling box cars. Did not know whether it was a switch engine that hit him or not; that the train that ran over him was running faster than he ever saw them running past his house; that it was running about twenty-five or thirty-five miles an hour. Colorado Street had plank walks running from the sidewalk

up the track. The walks were laid this way (indicating the direction at right angles to the track). The planks inside the track were laid running the same way as the track; that the planks inside were parallel with the track; that at the time he got his foot fastened in there the planks were rotten; that he broke part of the plank off; that it was rotten and broke off; that he fell on the south side of the track; that the engine was the first thing that hit him when he was struck; that it was the engine which mashed off his feet; that he did not fall and get his feet under the last car of the train; that he was not jumping on or catching hold of the cars; that when he got to the track the engine had not got to him.

"I did testify (in May, 1902) that No. 763 (switch engine) was engaged in it, and that the numbers ran up as high as 767. I did testify that engine 764 was engaged in it (switching) then. I did testify to that. That is true. It is correct. I do recollect that at that time they were using engines running from 760 to 767, and that they were using engines 763 and 764. I knew the numbers from seeing them pass my house. When an engine passed by there was always a big number on the side of the engine. I knew the numbers of the engines they used in switching."

Lucy Williams testified for plaintiff, in substance, as follows: That she and her mother, Sarah Nelson, were on Winter Street about a block and a half from Jimmy Washington, and saw him going to the track on Colorado Street; that she saw a train coming, but did not pay any attention. "As the train approached, he left the track to get out of the way, and we looked and the boy was stooping down. After the train passed him, I saw him fall, but I did not know whether the train knocked him down or not, on account of the smoke that come down over him, and after the train all had passed there, we saw he was hurt."

She further testified that she did not know whether or not the boy was trying to get on the train at the time he fell, and that the train by which he was injured was drawn by a switch engine.

Sarah Nelson testified for plaintiff that she saw James Washington coming up Colorado Street towards Winter Street, and run on the track; that a train was then coming from the west pretty fast, but she did not notice whether or not the boy got off the track.

Mrs. Walker testified for plaintiff that on the evening the boy was injured she was driving north on Houston Avenue, which avenue crosses Winter Street two blocks east of Colorado Street, and hearing a train approaching she stopped when she reached Winter Street to see from which direction the train was coming, and looked up to Colorado Street; that she saw the boy on the track, and the train was coming very fast; that she watched him and saw the train strike him and he fell over; that her horse got nervous and she turned around and did not wait to see any more; that after the train passed she crossed the track and met a crowd coming on that side; that the boy was on the south side of the track when he fell; that he was about two blocks west of where she was; that the train was coming from the west towards her very rapidly.

The following evidence was introduced in behalf of defendant: John Dixon, defendant's yard foreman, testified that the only trains drawn by switch engines which passed the place of the accident on the evening

it occurred were drawn by engines numbers 763 and 764. Engine number 763, with a train of cars passed about 5:45 p. m., and engine number 764 about 5:50 p. m. The engineer, the fireman, the foreman and three others, members of the crew operating the train drawn by engine number 764, all testified that no one was on the track when their train passed the place at which James Washington was injured; none of these witnesses saw the boy at any time and if he was injured by their train they knew nothing of it. The engineer and fireman both testified that they were keeping a lookout ahead of their train and there was nothing to prevent them from seeing the boy if he had been on the track. The foreman testified that the engine was backing and that he was on the end of the engine tank looking out for any one who might be on the track and that the boy could not have been on the track without his seeing him.

The engineer and two of the crew operating the train which was drawn by engine number 763 all testified that they did not see James Washington on the evening he was injured, and that he was not run over by their engine to their knowledge. They further testified that they were keeping a proper lookout and that the boy could not have been on the track as stated by him without their seeing him.

Of the remaining two members of this crew, Berry, the foreman, is dead, and the present whereabouts of Miller, the fireman, is not known.

E..T. Hubert testified that at the time of the accident he lived on the corner of Winter and Colorado Streets, and was familiar with the place of the accident, having kept a store and lived there for several years. He was in his store at the time of the accident and did not see the occurrence, but saw the boy immediately after he was injured and saw the train that injured him. It was a switching train composed of a switch engine and fifteen or twenty cars and was going east.

Will Underwood testified that he lived on the north side of defendant's track at the intersection of Winter and Colorado Streets, just opposite the place of the accident; that he was leaving his home to go to work at the time of the accident and saw the boy when he got hurt; that he was about 20 feet from the boy at the time, and saw the train run over him; that it was a switching train going east and was composed of twenty-five or thirty cars; that the four hind wheels of the last car ran over the boy's legs. He further testified: "The little Washington boy was standing just off the plank crossing on the ground, and between the cars as they passed me I could see him getting ready to catch on. Where I was standing was low ground and the bed of the track was high, so I could see the boy as high up as his shoulders. I saw him take two or three steps running alongside of the last car of the train. I saw one of his hands go up and then fall, while the other hand seemed to catch, and the next minute his body was swinging underneath the car in front of the hind wheels, and they run over his two legs. I ran over to him, picked him up and carried him over to Hubert's store. Alfred Nelson and Ed Hubert were at the store. When I reached him and picked him up, I said: "Kid, what the hell do you mean by trying to do that,' and he said, 'I was only trying to get a ride home.' There was no one else present when he said that to me. . . . I am working now and have been working since 1892 for the Houston & Texas Central Railroad Company."

Dr. William Olive, the physician who was called to attend the boy and who amputated his legs, testified as follows:

"My recollection is that James Washington made a statement in my presence that he was walking along the track and as the car passed him he made an effort to catch the car and fell under it. That is my recollection. It has been several years ago. It is my recollection he made this statement before I amputated his legs, while I was questioning him as to how he got hurt. It must have been several years after the accident when I was first called as a witness. I had not given the facts with reference to this case any more thought than to any other case. It is my recollection that the boy stated that he tried to catch on to the car. I would not undertake to repeat the words he used in making this statement. It is barely possible, though hardly probable, that I have his statement confused with the statement of some one else, or the statement of some one else confused with his. It is hardly probable, however, that I have."

A. Vann, witness for defendant, testified that at the time of the accident he was claim agent for the defendant company; that he went to the house of plaintiff James Washington on the 4th day of April, 1896, and that the plaintiff made the following statement before him, which he reduced to writing, and which was signed by the plaintiff, James Washington, which statement is as follows:

"On the day I was injured, I was coming from church, and walking up the railroad track, when I heard a train coming from Cheney Junction towards the Fifth Ward depot. I stepped off the track and stood beside the passing train. Just as the last box car was passing me, I stepped close to the train, and as I did so my foot struck against something in the street, and I fell, and my feet went under the box car and cut both my feet off. I did not attempt to get on the train; only stood near the track and intended stepping on the track behind the train and going on home. There was no one with me at the time I was hurt. Albert Nelson was the first one to reach me after I was run over. I did not see any of the trainmen just before I was hurt. They did not stop or notice me in any way. The accident happened on the street on which Hubert's store is located. A lawyer has been down to see me, and he told me not to tell any one how the accident happened. I am ten years old. My father is named George B. Washington, and works for Inman & Company, at Inman Press. I live on the corner of Holly Street and Winter Street. My mother is dead. I have three brothers. The engine pulling the train was switch engine number 763. I did not attempt to catch the truss rods, nor in any way attempt to get on the train. This the 4th day of April, 1896. (Signed)  James Washington."

Ed. S. Phelps, for defendant, testified to having taken the *ex parte* deposition of James Washington in a suit brought by him in Harris County to recover for the injuries for which recovery is sought in this suit. The witness testified that he swore James Washington and then propounded to him the questions in the order in which they appeared in the interrogatories; that he explained the questions to the boy and reduced his answers to writing; that this was done at the home of the plaintiff; that his answers were read over to him, and he was asked if he

desired to make any change, the answers being reduced to writing just as he answered them. Said depositions were signed and sworn to by the plaintiff; that shortly after he got to the home of James Washington, his father came in and remained there during the balance of the time that he was taking the depositions.

In these depositions James Washington makes the following statements: "It is not a fact that I was attempting to catch on a car in that train and lost my hold and fell. It is not true that I jumped on and off moving trains. I have gotten on and off and across cars standing still. Once I had gotten on a car, and it started to move, and I got off. My father told me not to get on and off moving trains, and I did not disobey him. I was in good health at the time of my injury. My stumbling over the plank walk was the thing that caused me to fall under the moving car. It is a fact the engine and nearly the whole train got by me before any part of it ran over me. I was entirely clear of the track until I fell under the wheels next to the last car in the train, and it ran over me. After I thus fell under the train, it was impossible to have stopped the train in time to have avoided striking me. Up to the time I fell with my legs under the next to the last car, there was nothing in my action to indicate to any one of the train men or any one else that I was in a dangerous position."

He also admitted that he had made the statement to the witness Vann before set out.

The Harris County suit was filed April 4, 1896, and was dismissed for want of prosecution in October, 1896, and about two years thereafter this suit was filed in Wharton County. The petition in the suit filed in Harris County does not charge that the crossing was defective in any particular and contains no allegation that James Washington was caught and held on the track by his foot becoming fastened in a hole in the crossing. The only allegations stating the cause of action are that while crossing defendant's track in a public street of the city of Houston James Washington was run over and injured by one of defendant's trains and that said accident was due to the negligence of defendant's employes in operating the train at a high rate of speed and failing to keep a proper lookout and to give proper signals when approaching the street crossing.

On the trial below James Washington admitted that he had signed a paper prepared for him by Mr. Vann, but stated that he did not know at the time he signed it what the paper contained, and denied that he made the statements contained in said paper. He testified to the same effect in regard to the depositions taken by Mr. Phelps.

The trial by a jury in the court below resulted in a verdict in favor of plaintiff for the sum of $12,000.

The fifth and sixth assignments predicate error upon the refusal of the trial court to grant a new trial on the ground that the court permitted counsel for the plaintiff in his closing speech to the jury to go outside of the record and abuse and villify witness for the defendant, and to use improper and inflammatory language which was calculated to and did arouse a feeling of passion and prejudice in the minds of the jury against the defendant. The bills of exceptions set out the argument objected to at length, and we think the objections made to it are valid. The follow-

ing excerpts taken from the bill of exceptions sufficiently discloses the character of the argument:

"Mr. Kelly says he don't abuse witnesses. I don't either. I say that when an attorney says things about a witness that are not true then he is abusing him, but when a man tells the truth about a witness, it is not abuse. I am going to tell you what I believe is the truth about Will Underwood. I believe he is the most ungodly liar that ever gave testimony in a court, and I believe I can show it. Will Underwood's testimony put them in a dilemma, and I will show it to you. Talk about fraud! Talk about fake! I wonder where Mr. Kelly is? He told me he was going to stay here because he expected to catch me in my argument, but he has run at the first shot!

"Talk about fakes and frauds. If there is any of it here it rests on the Galveston, Harrisburg & San Antonio, and principally upon two of their agents, A. Vann and Ed Phelps.

"At the time that company committed this crime—I will call it a crime, running over this boy and leaving him to die like a dog, not even stopping the train to see what they had done—at that time they were violating the law, and every man of that crew was liable to be arrested and put in jail for it, until he gave bond to appear in court. Underwood was standing thirty-five or forty feet from the track, and what did he see? You, gentlemen, are practical business men. I don't think there is a man on this jury who hasn't seen a train or ridden on it. My friend Ahlday is the youngest man on that jury, and I know that he has often seen them flash by this point over this track here.

"They have another way. The only defense that they set up is, that the boy was trying to jump on the train, and they try to support Will Underwood a little by the evidence of Ed Hubert. They try to break it down by the depositions that Phelps took, and the statement that Vann took, and by that they try to contradict the boy.

"And Mr. Vann, the chief detective of the railway at that time, he called himself a claim agent—starts out to do what? To get a fair and impartial statement from that boy? No, sir; but to go to that boy's house, and, if he could, to extort from him a statement that would relieve the railroad company from responsibility. Mr. Billy Brooks says they went to see if they were responsible, so they could settle it. Who ever heard of a railway company going out to see if they were responsible? I have known of them being willing to compromise in a cinch case against them, but I never heard of one trying to find out if it was responsible. They sent Mr. Vann out to see about this case, and if Mr. Vann had reported right this case would have been settled long ago. But Mr. Vann had an idea of his own.

"Gentlemen, I have known Mr. Kelly to figure in many cases in which he got half the recovery, and I have helped him try them. Kelly has several cases on this docket now in which he gets a part of the recovery. Kelly, are you trying to rob old man Lowe because you are interested in the recovery?

"I expect Carter has figured in a good many, and when they find a man is a good man they reach out, that octopus, with its long arms, reach out one of its tentacles, and says, 'Come down to Baker, Botts, Baker &

Lovett's office. We will give you a good salary. We are tired of having you gouge the railroad.' Talk about fakes.

"Mr. Vann, he is one of those tentacles. It was his business to reach out with one of those long arms and hover over that ten-year-old boy, his feet severed from him, ten days after he was wounded, suffering the agonies of the damned, with visions of engine 763 and 764, and all the engines of the world crashing over his body, with his brain distorted by suffering, and by the medicines given him, and the shock of his wound.

"Here comes this great big vampire, with his great beak and his wings flapping. I expect that boy thought it was the archangel from below coming after him. He hovers over the boy, and tells him: 'Here, Jimmy, I want you to sign this paper,' and Jimmy signed it. I believe it happened that way. I believe it was written out before he went there. He asked Jimmy how it happened, and Jimmy gave him a distorted statement, the best he could in his terrible mental agony, and this glorious claim agent made out a remarkable statement and said, 'Jimmy sign it,' and Jimmy signed it. I believe it was the vaporings of that imagination of a ten year old boy, with his body racked with agony, the wanderings of a distorted brain, that Vann wrote out. And then you bring that into a decent court, before a reputable jury, and ask them to believe it.

"When they got that paper in the office of the railroad company, and it got to Baker, Botts, Baker & Lovett, their distinguished attorneys, they found it was not sworn to. They would have to take other steps. In the meantime suit was brought. What did they do? They sent another one of their agents out there, and aint it a singular coincidence that when our priestly looking friend, Mr. Phelps, arrived on the scene that he selected the 19th day of June to go, the day it is notorious all over Texas as the day the colored people celebrate their emancipation, the day they consider it a religious duty to observe. Phelps selected the 19th of June, and, by a singular coincidence, when he got there, nobody was present.

"His father came in afterwards. You jump at conclusions too quick. I aint going to cover anything up. He got down there and nobody was there, and he invades the home of that man, George Washington—lawyer going down to take an ex parte deposition—and gentlemen, do you know what an ex parte deposition is? In a civil case I want to take your deposition. I prepare interrogatories addressed to you and file them with the clerk, and the other side can see them and add cross interrogatories, when they are handed back to the clerk who sends them to an officer, and that officer takes the depositions—the answers to my questions and those of the other side. But an ex parte deposition is another thing. I will tell you what it is. It is a cruel, unjust law, by which one side can file interrogatories without anybody ever seeing them. That is the true ex parte deposition. They sent Phelps down there to take an ex parte deposition of that boy three or four months after the accident happened. What for? To bolster up that paper of Vann's. I believe they prepared that deposition with this statement before them. Every question in it is predicated on that statement. Phelps goes down there and walks in. What does he find? Nobody in the house. It is true, as Mr. Kelly says, his father came in. He was a negro. If he had been a

white man he would have kicked Phelps out.    He had no right there. But the boy's father was a negro."

There is nothing in the testimony nor in the argument of defendant's counsel as shown by the bill of exceptions or elsewhere in the record which justified the plaintiff's counsel in denouncing the defendant as an octopus, and it and its witnesses Vann and Phelps, as frauds and fakes, nor is there any justification for the charge that the witness Phelps was acting as the agent of the defendant when he took the boy's deposition.    He was a sworn officer of the law, and in securing the depositions was acting in that capacity and not as an agent of the defendant.

George Washington was present when the depositions were taken and heard what they contained, and though he brings this suit as next friend of his minor son he did not testify in the case.    The testimony showed that at the time the depositions were taken the boy was sitting up in bed, and there is no evidence that he was then suffering any pain whatever.    The statement that the counsel believed that the witness Will Underwood was an ungodly liar was also improper.    It was permissible for him to argue to the jury that the evidence in the case showed that statements of defendant's witnesses were not true, but we do not think it was proper for him to apply to them the abusive language shown in the bill of exceptions.    Much of this argument was outside of the record, and its general inflammatory and vituperative character is apparent.    We do not think the impropriety of the argument taken as a whole, or that it was prejudicial in its character can be seriously questioned.    (Dillingham v. Scales, 78 Texas, 207; Chicago, R. I. & T. Ry. Co. v. Musick, 8 Texas Ct. Rep., 264; Gulf, C. & S. F. Ry. Co. v. Scott, 26 S. W. Rep., 999; Wichita V. M. & Elevator Co. v. Hobbs, 5 Texas Civ. App., 35; Galveston, H. & H. Ry. Co. v. Cooper, 70 Texas, 69.)

Appellees contend that the assignments should be overruled because the bill of exceptions shows that no exceptions were taken to the argument at the time it was made, and the court was not requested by counsel for appellant to instruct the jury to disregard it.    Under this contention it is insisted that the holding of this court in case of Houston & T. C. Ry. Co. v. Rehm, 11 Texas Ct. Rep., 41, that there might be such gross violation of the rules governing the argument of a case before a jury as to require a reversal of the judgment notwithstanding no exception was taken to the argument at the time it was made, and no request was made to instruct the jury to disregard it, is not supported by any authority.

We have no doubt of the soundness of that opinion, and think it is supported by the authorities therein cited.    We do not hold, however, that the argument in this case is of such character as would call for the application of the rule announced in the Rehm case.

The reason, or one of the reasons, given by the appellant's attorneys in their bill of exceptions for not excepting to the argument at the time it was made, and not requesting a charge instructing the jury to disregard it, was because it was known to them that the trial court would not sustain an objection to the argument, and that he had repeatedly stated that he would not sustain objections to improper arguments made to juries in his court, but would place the responsibility on the attorney making such argument.    In approving this bill of exceptions the trial judge makes the following statement:    "I will state further, that I

never reprimand any attorney for any remarks made out of the record, nor do I instruct the jury to disregard them."

The rule which requires that improper argument shall be excepted to at the time it is made is primarily based upon the ground that unless the attention of the trial judge is called to the objectionable argument it may escape his notice, and no opportunity having been given him by the complaining party to correct the error before the verdict, such party will not be permitted to speculate on the chance of a verdict in his favor, and then take advantage of the error on a motion for a new trial. It is obvious that this reason does not apply when the trial court has established a rule that he will in no case sustain an objection to improper argument, and will never instruct a jury to disregard an argument however improper it may be. To require an attorney under these circumstances to interpose an objection to an unauthorized argument would not only require the doing of a vain and useless thing, but one that would increase the harmful effects of the error of which he sought to complain, because the jury could reasonably conclude from the action of the judge in overruling the objection that the objectionable argument was authorized. To require an exception to be made under such circumstances would be manifestly unjust and unfair, and the rule invoked by appellees should not be applied in this case.

It only remains for us to consider the probable effect of the violation in this case of the rules of argument as before shown.

Whenever these rules are violated a substantial right is infringed, and unless it be made to appear that the complaining party has waived his right to complain by failing to except at the proper time, or by provoking the improper argument, or that such argument did not probably affect the result of the trial, a new trial should be granted.

We have already held that the failure of appellant's counsel to except to the argument under the circumstances shown by the bill of exceptions does not prevent appellant from now urging such objection, and that the argument complained of was not provoked by anything said by appellant's counsel in their addresses to the jury, and we can not say in view of the conflict in the evidence upon the issue of appellant's liability, that it is not probable that the jury were influenced by said improper argument. These conclusions require a reversal of the judgment of the trial court. (Houston, E. & W. T. Ry. Co. v. McCarty, 13 Texas Ct. Rep., 876.)

Whenever a trial in a lower court is free from irregularity and the record shows that every right of the litigants have been properly safeguarded, this court has uniformly refused to disturb the verdict of a jury upon conflicting evidence unless the verdict is so against the great weight and preponderance of the evidence as to justify the conclusion from that fact alone, that the jury were improperly influenced; but no such sanctity can be attached to the finding of a jury when the record shows that they were probably influenced by an argument not founded on or authorized by the evidence before them, and which was marked by vituperation and abuse well calculated to arouse the passion and prejudice of the jury, and which have no proper place in any argument.

As we have before said in the case of Western Union Tel. Co. v. Burgess, 60 S. W. Rep., 1023, it is no reflection upon the integrity or the

intelligence of a jury to hold that they may have been influenced by improper argument of counsel, even when they are told by the court to disregard such argument, because the human mind is often unconsciously controlled by influences which it has striven to combat and which it believes it has overcome. In recognition of this fact, the law throws around a jury every safeguard to keep their minds free from every impression except such as is produced by the legal evidence admitted in the case, and a disregard of these safeguards in the trial of a case makes it the duty of an Appellate Court to set aside the verdict of the jury in all cases in which it is probable that such irregularity has been injurious to the party complaining of it. (International & G. N. Ry. Co. v. Irvine, 64 Texas, 529; Willis v. Lowry, 66 Texas, 542; Willis v. McNeill, 57 Texas, 475; Brown v. Swineford, 44 Wis., 282.)

Because in our opinion a new trial should have been granted on the ground stated in the assignments above discussed, the judgment of the court below is reversed and the cause remanded.

*Reversed and remanded.*

Writ of error dismissed for want of jurisdiction.