### ALAMO IRON WORKS v. PRADO.
### (No. 6327.)

(Court of Civil Appeals of Texas. San Antonio. Feb. 11, 1920. On Motion for Rehearing, April 7, 1920.)

1. **Municipal corporations** ⊚〰706(7)—**Evidence held to warrant refusal of instruction that bicyclist was contributorily negligent.**

Testimony by a bicyclist that he saw a truck before it started to turn, but did not see it after it started to turn before reaching the center of the street intersection until it was too close for him to avoid the accident, *held* to justify refusal of a directed verdict for defendant on the ground of contributory negligence.

2. **Municipal corporations** ⊚〰706(6)—**Evidence held sufficient to sustain submission of discovered peril of bicyclist.**

In an action for injuries to bicyclist who collided with a motortruck which turned at a street intersection across plaintiff's path, evidence of the truck driver and others *held* sufficient to warrant the submission of special issue whether driver discovered plaintiff's peril in time to have avoided the accident.

3. **Appeal and error** ⊚〰1062(4)—**Submission of uncontroverted issue whether peril was discovered held not prejudicial.**

That the testimony was uncontradicted that a truck driver discovered plaintiff's peril before the collision does not make the submission of such issue to the jury error prejudicial to defendant.

4. **Trial** ⊚〰351(2) — **Special issue requiring finding that truck driver discovered bicyclist's approach is inaccurate.**

A special issue, requested by defendant, as to whether its truck driver discovered the approach of plaintiff, was inaccurate, since he might have discovered the approach without discovering the peril.

5. **Trial** ⊚〰351(5)—**Request covered by correct special issues need not be given.**

Where requested special charge on discovered peril was sufficiently embraced in the

court's charge and the special issues correctly submitted that issue, it was not error to refuse the request.

**6. Municipal corporations ☞705(1) — Truck driver not excused by emergency created by own acts.**

A truck driver cannot be relieved from the consequences of his failure to take proper action after discovering plaintiff's peril by claiming that he acted in an emergency, where the emergency was created by his own violation of the traffic laws and ordinances.

**7. Municipal corporations ☞705(1)—Acts in emergency after discovering peril need not be wanton or reckless.**

To entitle plaintiff to recover for defendant's improper acts in an emergency after he had discovered plaintiff's peril, it need not be shown that defendant's acts were wanton or reckless.

**8. Trial ☞261—Incorrect request may call for submission of correct charge.**

A requested special charge, though incorrect, requires the court in a proper case to submit a correct charge on the issue to which the incorrect charge was directed.

**9. Appeal and error ☞218(2)—General exception to contributory negligence issue in language of answer is insufficient.**

An assignment that the special issue on contributory negligence narrowed the defense cannot be sustained, where the issue followed generally the language of the answer, and the only exception was that it was erroneous, and that the restricting words should have been stricken out; it being the duty of defendant in such case to prepare and present a charge as required by Rev. St. art. 1985.

**10. Municipal corporations ☞706(6) — Evidence held to warrant issue whether truck driver gave signal for turn.**

In action for injuries to a bicyclist who collided with a truck which was turning at a street intersection, evidence by plaintiff that he watched the truck and saw no signal, though contradicted by testimony of others that the driver gave a signal, *held* sufficient to authorize submission of the issue whether the signal was given.

**11. Trial ☞260(8)—After charge that negligence must be direct cause, refusal to charge on proximate cause not error.**

Where the court had required the jury to find whether the negligence of defendant directly caused the accident, it was not error to refuse a requested charge that the direct cause is the proximate cause without which the accident would not have happened, since "direct cause" needs no definition, and would be better understood than "proximate cause," and laid a heavier burden on plaintiff than a requirement to find proximate cause would have done.

**12. Municipal corporations ☞705(2)—Duty of turning vehicle to give right of way to one going straight is not qualified.**

The duty under a city ordinance for a vehicle turning from its course at a street intersection to yield right of way to a vehicle keeping a straight course is not qualified so as to authorize making the turn merely, because, viewed from the standpoint of the driver, it reasonably appeared to him to be safe.

**13. Exceptions, bill of ☞54—Statute authorizing bystanders' bill assumes prior application to court.**

Vernon's Sayles' Ann. Civ. St. 1914, art. 2067, authorizing bill of exceptions signed by bystanders if the party is dissatisfied with the bill filed by the judge, contemplates the prior filing of a bill by the court as provided in article 2066, but does not deny the right to prove by bystanders bills of exceptions refused by the court, where none are prepared in lieu thereof by the court as directed by the statute.

**14. Exceptions, bill of ☞54—Bystanders' bill filed within time allowed held in time.**

Where a bill of exceptions was filed within the term, but was retained by the judge until after the term, and then rejected without a new bill prepared by the judge in lieu thereof, a bystanders' bill, filed thereafter within the time fixed by the authority of Vernon's Sayles' Ann. Civ. St. 1914, art. 2073, for filing bills of exceptions and statements of fact, was in time.

**15. Exceptions, bill of ☞54—Jurors can sign as "bystanders."**

Though jurors are not "bystanders" at the trial of a case in the ordinary meaning of that term, they can sign a bystanders' bill of exceptions to acts and comments by the court and the argument of attorneys thereon, since as to those matters they are impartial.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Bystander.]

### On Motion for Rehearing.

**16. Exceptions, bill of ☞54—Bystanders' bill need not be signed at time.**

Though originally a bill of exceptions authenticated by bystanders must have been made at the time of the occurrence, the statutes, extending the time for filing the bill, if approved by the court, also extended the time for filing the bystanders' bill.

**17. Exceptions, bill of ☞54—Juror's duties do not prevent their signing as bystanders.**

The fact that jurors, because of their situation and duties, could not sign a certificate as bystanders, authenticating a bill of exception at the time the occurrence took place, does not prevent them from signing such bill as bystanders after their discharge.

**18. Exceptions, bill of ☞2—Statutes must be liberally construed.**

Statutes relating to filing bills of exception, like other statutes relating to appeals, are always liberally construed.

**19. Exceptions, bill of ☞5—Failure to take exception does not authorize denial of bill.**

Failure to except or object to the action of the court is not a ground for rejection of the bill by the court, though the bill may show such failure, so that the matters therein stated cannot be reviewed.

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

**20. Trial ⬉29(4)—Court cannot examine injuries and state conclusions in jury's presence.**

Where in an action for personal injuries the parties agreed that physicians might measure in the jury's presence plaintiff's legs to determine whether one was shorter than the other, it was error for the judge during the examination by the physicians to make measurements himself, and to state before the jury that one of plaintiff's hips was higher than the other.

**21. Appeal and error ⬉1046(5)—Comment by court on undisputed fact held not harmless.**

Though the evidence that one of plaintiff's hips was higher than the other was undisputed, the court's statement to that effect was prejudicial to defendant, where plaintiff's counsel argued that the condition was the result of the injuries sustained and the verdict was for a large amount.

**22. Appeal and error ⬉207—Objection to argument unnecessary where harm cannot be removed.**

An objection to argument of counsel and request for action by the court thereon is not necessary to authorize reversal, where the argument was so prejudicial in character that no action by the court could have removed the effect thereof from the jury.

**23. Exceptions, bill of ⬉51—Cannot be rejected by trial court for disagreement with facts.**

That the trial court did not concur with the facts as stated in the bill of exceptions tendered is not ground for final rejection of the bill, but the court should qualify it to state the facts as he understands them, or should prepare a new bill stating the facts.

Appeal from District Court, Bexar County; R. B. Minor, Judge.

Action by Emilio R. Prado against the Alamo Iron Works. Judgment for plaintiff, and defendant appeals. Reversed and remanded.

Lewright & Douglas, of San Antonio, for appellant.

Dwyer & Dwyer, Perry J. Lewis, H. C. Carter, Randolph L. Carter, and Champe G. Carter, all of San Antonio, for appellee.

COBBS, J.   This suit was to recover $20,-000 for personal injuries, $20, the value of a bicycle, and $100 medical treatment by Emilio R. Prado, appellee, against Alamo Iron Works, appellant.   It was tried by a jury upon special issues, resulting in a judgment in favor of appellee against appellant in the sum of $9,500.

The claim for damages was predicated upon the alleged collision between appellee and appellant, while appellee was riding a bicycle at the intersection of Ninth and Austin streets in the city of San Antonio, where he was struck by an automobile truck operated for appellant, which occasioned the injury by its alleged negligence, as follows:

"In turning the truck into Ninth street from Austin street before reaching the center of Ninth street; in failing to give a signal before making said turn; in turning into Ninth street at a rapid and dangerous rate of speed; and in the driver of the truck failing to exercise ordinary care to avoid injuring plaintiff after discovering that he was in a position of peril.

"Defendant answered by general denial, and also by special plea, alleging contributory negligence on the part of plaintiff as follows: That plaintiff 'did not look ahead where he was going,' and thus ran into said truck at full speed; and that by the exercise of ordinary care plaintiff could and would have seen the truck, and would have avoided the collision."

The first assignment complains the court erred in refusing to give a peremptory instruction to the jury to return a verdict in favor of appellant, as requested by special charge No. A, upon the ground that the evidence shows beyond dispute that the accident would not have occurred except for the negligence of plaintiff (appellee) himself, at and immediately prior to such accident.

Such a charge is, of course, predicated upon the theory that either there was no fact to be submitted to the jury at all, or, if submitted, not sufficient in law to predicate a recovery, or that it was all one way and undisputed.   This assignment requires an examination of all the facts to determine the question.

The proposition is appellant was guilty of contributory negligence in failing to look for other vehicles at the intersection where the accident occurred ,which caused or contributed to bring about the collision, and that no issue of discovered peril was raised by the evidence.   Appellee was therefore precluded from a recovery as a matter of law.

The appellee insists because the motion for a new trial only states the trial court erred in refusing to give a peremptory instruction as requested by the charge, without stating to the court any grounds or any reason why a peremptory instruction should have been given, did not properly inform the trial court of the grounds of objection, and are too general to be considered, and further contended it embraced a double contention in that: First, the appellee was guilty of contributory negligence in failing to look; and, second, that the issue of discovered peril is not raised by any evidence.

It is well enough in the outset to here follow appellee's statement, presented in a concrete form, of the findings of the jury upon the issues as follows:

"That the appellant's automobile truck turned into Ninth street at a negligent rate of speed; second, that the driver of the automobile truck turned to the left to enter Ninth street before

reaching the center of the crossing, and, third, that the driver of the automobile truck failed to give a visible or audible signal before making the turn, and that each of these acts caused the accident and injuries to the plaintiff. Two of these acts of negligence, namely, the negligent rate of speed and the turning of the truck before reaching the center of the crossing, are not questioned at all by the appellant in its brief. * * *"

It is not shown that they did not produce the collision. The law regulating the speed of vehicles is as follows:

Article 820k, Vernon's Pen. Code 1918 Supp., provides:

"(g) All vehicles approaching an intersection of the public highway with the intention of turning thereat, shall, in turning to the right, keep to the right of the center of such intersection and in turning to the left, shall run beyond the center of such intersection, passing to the right before turning such vehicle to the left."

"(k) The person in charge of any vehicle in or upon any public highway, before turning, stopping or changing the course of such vehicle, shall see first that there is sufficient space for such movement to be made in safety, and if the movement or operation of other vehicles may reasonably be affected by such turning, stopping or changing of course, shall give plainly visible or audible signal to the person operating, driving or in charge of such vehicle of his intentions so to turn, stop or change said course."

Rule 26 of the city ordinances of the city of San Antonio, introduced in evidence, provides:

"When two vehicles approach one another on the same street in opposite directions and the driver of one or both vehicles desires to turn off on a side street (a) the vehicle which continues on the street in the original direction has the right of way over the vehicle turning off."

[1] The testimony of appellee was to the effect he came on the right-hand side of Austin street, traveling 6 or 7 miles an hour on his bicycle, got on the south side of Ninth street, saw the automobile coming on the right side, the side appellee belonged on, and thought he was coming straight up Austin street. Appellant never gave a signal, sign, or anything, and when he went to turn round turned so quick, coming about 10 or 15 miles an hour at the time he noticed appellant, could not avoid appellant striking him. Appellee further testified:

"The autotruck never gave a signal, and when I got here (indicating) to the corner, he struck me; he turned right here at the corner, on this side (indicating). He was going about 15 or 20 miles. He should have come over here (indicating) and turned to the right or center of Austin street, taken the right side; he did not do that, he went to this side (indicating).

"I was struck about 5 or 6 feet from the corner of Ninth street, more or less. The driver of that autotruck made no sign whatever; he did not put out his hand; he did not stop and let me pass on; nor did he blow his horn.

"I watched the truck during the time it passed from letter D to letter G. It was coming this way (indicating). It was coming straight, and I was looking at it all the time. I didn't see the automobile when he started to make the turn. I can't just exactly say how many feet the automobile was from me when I looked up and saw it just before it hit me, but I was about here (indicating letter E) when I was struck.

"I was about 4 or 5 feet from the automobile when I first saw it right here at E, and I was going then at 6 or 7 miles per hour; I hadn't been going faster than that. I hadn't been looking down to the ground ahead of my bicycle just before I got to E; I was looking to the front. I didn't see the automobile from over here because I was taking care of my right side.

"From the time I first saw the automobile up until the time the car struck me I did not see the man on the automobile give any signal at all; never heard any blowing of the horn. He did not sound the horn or blow the horn; I am sure of that. I will swear he never put out his hand at all before he began to turn into Ninth street; I didn't see him put his hand out. When I saw him the last time at G, the truck was still going due north; was still coming straight when I noticed him, straight north; that was the reason that I thought he wasn't going to turn there. I didn't see the automobile while it was turning; didn't see it until he came right close here, where he reached me; I didn't have no time to get away.

"I never saw the truck from the time I first looked at it until just a few moments before it struck me; it didn't give me any time to get away. I didn't see the truck when it was at the corner of Chestnut street and Austin street —it was coming from here (indicating letter D). I watched the truck from the time I first saw it until it got down to the corner of Chestnut street and Austin street. I observed the truck there, but he gave me no signals, no signs. I kept one eye on the truck from the time I first saw it until it got up to the corner of Chestnut street and Austin street, until about when he made this turn, why, the first thing I saw he was close to me; I did not see him when he first began to make the turn, it had been a second or two, more or less, before that, that I saw him last. When I last saw the truck just before it began to make the turn it was about right here (indicating place by letter G). I watched the truck during the time it passed from letter D to G. It was coming straight, and I was looking at it all the time; I didn't see the automobile when it started to make the turn. I can't just exactly say how many feet the automobile was from me when I looked up and saw it just before it hit me, but I was about here (indicating letter E) when I was struck. I didn't see no other vehicle on Austin street just before this accident.

"I was 4 or 5 feet from the automobile when I first saw it right here at E, and I was going then at 6 or 7 miles per hour.

"When I saw him the last time at G, the truck was still going due north, was still coming straight when I noticed him, straight north; that was the reason that I thought he wasn't going to turn there; I didn't see the automobile

while it was turning—didn't see it until he came right close here, where he reached me. I didn't have no time to get away."

Krebs, the driver, testified:

"I have testified that I couldn't say that the Mexican was looking down as he approached our car. I believe they have me saying that in this statement. The way he was, he—couldn't say he was looking down; he was down when I did see him; he had his head hanging down all right, but whether he was looking I couldn't tell you. His having his head down could not have had anything to do with this accident."

There was sufficient evidence to go to the jury on the issue, and the court did not err in refusing the requested charge, and the assignment is overruled.

The second assignment complains that the court erred in submitting special issues on discovered peril, claiming there was no evidence to support a finding that appellee's predicament of danger was discovered in time to have prevented the collision with the means at the command of the driver of the truck in the exercise of ordinary care. The charges complained of are special issues·Nos. 7 and 8.

No. 7 is: "Was perilous position of plaintiff discovered by the driver of automobile truck before collision?"

No. 8: "Did driver after he discovered plaintiff's perilous position fail to exercise ordinary care with the means at his disposal?"

The jury answered both these questions in the affirmative. The court had already defined "negligence" as the failure to exercise ordinary care, and "ordinary care" as that degree of care which a person of ordinary prudence would exercise under the same or similar ˙circumstances.

[2] From the testimony set out in appellant's brief under this assignment, as well as an inspection of the statement of facts, we find that the driver of the autotruck had a clear view down Austin street, and looked down there before he tried to turn. When he saw appellee he had already passed the corner of Ninth street, and was very close upon him. It might have been more than 12 feet he says; he did not know. Various distances were given.

The witness West, whose testimony appellant introduced, stated:

"I couldn't say the man on the bicycle saw the car. There was nothing to prevent him from seeing it—he was sitting right there on the bicycle, with his face right ahead, the way he was going, and as far as I could see he was riding the bicycle just in the ordinary way around the street, and his face looking the way he was going—that was the way he was when I saw him, sitting up on the bicycle, holding these handlebars, looking straight ahead, the way he was headed. There was nothing to keep the car from seeing him, both were driving towards each other, and the man on the bicycle and the man on the car both had equal opportunity of seeing each other. * * * With

reference to whether I could tell if the man on the bicycle was looking ahead of him or not to see what he was approaching, well, I couldn't tell exactly where he was; he was ahead of me; whether he had his eyes up or down a fellow can't tell. He was kinder leaning over on the bicycle."

Krebs, the driver, testified:

"When Mr. Volger hollered and called my attention, I saw him way up here (indicating). Well, at that moment he hollered, and I saw him and kept watching him, I just began to slow down gradually all the time. I didn't make a sudden stop, I did not put on the emergency. * * * I didn't stop as fast as I could. A Ford truck of that size with the materials I had on it could be stopped in 5 or 6 feet all right, going something like 6 to 10 miles an hour; could be stopped more suddenly than that I believe. I moved I think about 8 feet after I saw him before I came to a dead stop; when I first saw him the front of my car was practically on the line of Ninth street; I stopped within about 8 feet. From the time he hit me then until the time I came to a complete standstill was not more than 2 or 3 feet, from the momentum, from the place where he struck me. I remember after he struck me I did not move over 2 or 3 feet. I am sure about that; am positive about it."

The other witness Volger, riding on the truck when he saw the position of peril appellee was in, and shouted the warning to Krebs, the driver, stated, by using all means at hand, he might have stopped the car within 2 or 3 feet, but that the truck ran·a distance of 15 feet before it came to a full stop, and a distance of only 3 feet after striking appellee.

This assignment is overruled.

[3] The third assignment complains that special issue No. 7 submits an uncontroverted question, and thereby was reasonably calculated and probably did prejudice appellant before the jury. The point seems to be that as the driver did discover appellee's peril before the collision it was error to submit this charge.

This fact must always be first established before the doctrine of discovered peril applies, whether uncontroverted or proven. Then the further fact must be established whether after he discovered the peril of plaintiff's position he failed to exercise ordinary care with the means at his disposal to avoid the collision. The two facts are inseparable and indispensable in discovered peril. Under the doctrine of "discovered peril" the first consideration is whether or not the peril of the injured person was discovered in time to have prevented the injury by the exercise of ordinary care. San Antonio Co. v. Kumpf, 99 S. W. 863; Magee v. Cavins, 197 S. W. 1015; Cardwell v. Gulf Ry., 40 Tex. Civ. App. 67, 88 S. W. 422. The charge is harmless, and put no burden upon the appellant, and could not have prejudiced any right it had before the jury.

That the driver may at one time have seen the approach of appellee would not have been sufficient to satisfy the law, which required him to keep a lookout. At that time there might have been no peril. The test is, Did he discover the perilous position in time to prevent the accident as an ordinarily prudent man would have done similarly situated?

The fourth assignment is to the effect that the court in submitting issues Nos. 5, 7, and 8 left out a material element, in that it failed to charge whether the driver of the truck "discovered appellee in time to have prevented the collision by the use of the means at his command," and submitted the special issue to that effect, to cure the supposed error in the charge, which the court refused to give. The court in connection-with issues 7 and 8 gave special issue No. 9, to wit:

"Did such failure on the part of said driver directly cause the accident and any injuries to plaintiff which are alleged in his petition?"

[4] Now, the special issue No. 1 offered by appellant is not a correct proposition of law. It is as follows:

"Did the driver of the truck discover the approach of plaintiff just prior to the collision in time to have averted the accident by the means at his command?"

The jury might find that the truck driver's "approach" was discovered just before the collision, but they must also find, further, that he discovered the peril to appellee growing out of his approach in time to prevent it, and used all means at hand to prevent it.

[5] However, the special issues on discovered peril were correctly given by the court, and if this had been a correct charge the same was embraced sufficiently in the court's charge, and was properly refused. These bicycle riders, as well as these autotrucks, no doubt often approach each other, dangerously near, going in opposite directions, and yet carelessly not consider any peril to arise from such approaches, such as to support a cause of action or base a recovery in case of collision upon the doctrine of discovered peril. Such peril does not always arise from an approach alone, for to affirm such a charge would perhaps bring about disasterous results. There must be discovered peril in the situation discovered in time to require the use of all the means at hand, which upon failure to do so would hold him responsible for the injury resulting from his failure to use such means. As said in Traction Co. v. Kumpf, 99 S. W. 863:

"If their use would not have averted the accident, his failure to use such means would not be the proximate cause of the injury."

We overrule this assignment.

The fast driving of these motorcars upon the public streets and the fast flying motorcycles and bicycles in the cities and upon public thoroughfares call for condemnation, and should awaken in the traffic officers a very high degree of watchful care. These observations are made because of the frequency with which similar causes reach this court.

[6] Appellant's fifth assignment complains that the court erred in not giving requested special charge No. 2:

"That though driver may have discovered appellee's approach under circumstances which presented an emergency, though driver may have failed to exercise his best judgment or act in the most judicious manner, it wouldn't constitute want of proper care unless the driver acted wantonly or recklessly after discovering plaintiff's predicament."

This charge was requested to be submitted with special issue No. 8. This charge is not a correct statement of the law, and should not have been given, but appellant insists in his proposition that it is basis enough to call the court's attention to submit a proper form. An emergency in such a case, as laid down in Kelch v. National Contract Co., 178 Ky. 632, 199 S. W. 796, cited by appellant in support of his proposition, would be one not produced or "contributed to by the one seeking to rely on it; a failure to choose the safer of two courses of action as manifested by subsequent events will not constitute negligence, when the course selected was one dictated by ordinarily prudent action, such as an ordinarily prudent man would have selected under the circumstances."

[7] This charge would put another element or burden on the injured person to further show "that the driver acted wantonly or recklessly after discovering the plaintiff's predicament." There was no proof submitted in this case that would have justified that issue, and the authority cited does not apply.

[8] It is true it is required of the court in a proper case to submit a correct charge on an issue with respect to which an incorrect special charge has been asked. Southwestern. Portland Cement Co. v. McBrayer, 140 S. W. 388; Roberts v. Houston, 188 S. W. 257; San Antonio v. Castle, 199 S. W. 300; Electric Ry. Co. v. Harry, 37 Tex. Civ. App. 90, 83 S. W. 737. But we think the issue has already been sufficiently submitted, and therefore in such a case, where the issue is presented as in this case, the duty devolved on appellant, if he was not satisfied, to present, himself, a correct one, and not require the court to write another on the same subject.

We overrule appellant's sixth assignment of error, which complains of the refusal of the court to submit the following special issues:

(a) "Did both plaintiff and the driver of the truck fail to exercise ordinary care towards looking for approaching vehicles?" etc. (b) "Wheth-

er such failure directly and proximately caused the collision?"

Both issues have been sufficiently presented by the court's special questions, and answered by the findings of the jury. Zucht v. Brooks, 216 S. W. 684.

[9] Appellant's seventh assignment is: ·

"The court erred in submitting in twelfth issue the words, 'Have his eyes on the ground thus,'"

—alleging it was error to restrict the submission of this defense to plaintiff's failure to see the truck on account of having his eyes fixed upon the ground.

One of the alleged grounds of negligence that appellant pleaded was: Appellee was riding down the street at a rapid rate of speed, with his eyes fastened on the ground, and thus ran headlong into the truck without seeing it; otherwise he would have seen the truck, and by ordinary care for his safety would have averted the accident.

We are inclined to think this charge rather narrowed the defense, but it presented in a way the appellant's defense of appellee's contributory negligence in failing to keep a proper lookout; and, the court having submitted the issue almost in the language of the appellant's pleading, it was not incumbent then to submit it further, upon appellant's mere exception to the charge that it was erroneous, and that the complained of words should have been stricken out. Having thus submitted the issue, which was not satisfactory to appellant, it was incumbent upon it to prepare and present to the court a charge covering the issue from his standpoint on the precise question. Revised Civil Statutes (Vernon's) art. 1985; State v. City Polytechnic, 194 S. W. 1136; Funderburgh v. Skinner, 209 S. W. 452; Sumner v. Kinney, 136 S. W. 1192.

The issues submitted to the jury on discovered peril and their findings in reference thereto eliminates the question of contributory negligence from the case, and we can see no reason for further discussing it. ·

[10] In assignment 8 appellant assigns as error the charge of the court in giving special issue No. 5, because the matters therein referred to were settled by the uncontroverted and undisputed testimony that a visible signal was given, while there was no evidence that an audible signal was given. Volger and Krebs, appellant's witnesses, state the driver held out his left arm. No horn was blown. Appellee testified on the same subject:

"He never gave me a signal or sign or anything, and when he went to turn around he turned so quick. I don't know whether that truck ever slowed up in speed after I first saw it, because the first thing I knew I was struck. I never saw the truck from the time I first looked at it until just a few moments before it struck me. It didn't give me any time to get away. * * * I did not see him when he first began to make the turn. It had been a second or two, more or less, before that that I saw him last. When I last saw the truck just before it began to make the turn it was right here (indicating place by letter G, Exhibit 6). I watched the truck during the time it passed from letter D to letter G. It was coming this way (indicating); it was coming straight, and I was looking at it all of the time. I didn't see the automobile when he started to make the turn."

There arose a disputed question of fact for the jury to reconcile. The effect of their finding was that no signal of any kind was given. Such facts belong to the jury for ascertainment, and the issue was properly submitted. The jury having found that appellee turned the corner at a negligent rate of speed and turned into Ninth street before reaching the center of the intersection, causing the accident, in direct violation of the city ordinances in such cases, we may forego any further discussion of this assignment, and overrule it.

Appellant's assignment No. 10 complains that the court erred in not giving its special charge No. 1 as explanatory of and amplifying the court's Nos. 2, 4, 6, to wit:

"Bear in mind that the direct cause of an accident such as involved herein is the proximate cause thereof without which the accident would not have happened."

This charge was refused.

"Question No. 1 was whether the automobile turned into Ninth street at a negligent rate of speed, question No. 3 was whether it turned into Ninth street before reaching the center of that street, and question No. 5 was whether a visible or audible signal was given before making the turn. Questions Nos. 2, 4, 6, followed, respectively, in the numerical order, and called upon the jury to say in each instance whether the act of negligence referred to in the preceding question directly caused the accident and any injuries to plaintiff."

[11] It is true proximate cause is defined as the direct cause without which the injury would not have happened. Galveston Ry. v. Averill, 136 S. W. 98; Tex. Ry. v. Miles, 192 S. W. 1138; Railway Co. v. Oram, 92 S. W. 1029.

· The term "direct cause" is much more limited in its application than "proximate cause." This case was submitted upon the theory that there could be no recovery except in case the injuries were directly caused by the defendant's negligence. The charge was very favorable to the defendant. It is not improper in such cases to define proximate cause, but the word, "direct" has a plainer and more direct meaning to the average jury, for they would always understand its meaning, whereas they might not understand proximate cause unless explained, and the definition offered by appellants left it unex-

plained. We do not, as said in Railway v. Oram, supra, with respect to a failure to define proximate cause, see how the jury could have been misled by the failure to give a charge defining direct cause in this case. Direct cause needs no definition to define it, yet its meaning might be amplified; but we do not think the court erred in this ruling, and we overrule the assignment.

[12] The eleventh assignment complains that the court erred in not giving his special requested charge No. 3 in explanation of and in connection with that portion of the court's charge in submitting the city ordinance to the jury to the effect, under and by virtue of the ordinance of the city of San Antonio:

"When two vehicles approach one another on the same street in opposite directions, and the driver of one of them desires to turn off of said street, the vehicle which continues on the street in the original direction has the right of way over the vehicle turning off."

The appellant requested the court to further charge:

The situation "must be viewed from the standpoint of a driver in the light of all the attending circumstances; and if it reasonably appears to him in the light of the attending circumstances that he can, without endangering the safety of others, make a turn at a street intersection, it would not be a violation of said ordinance for him under such circumstances to make such turn."

The case cited in support of this charge, of Sumner v. Kinney, 136 S. W. 1192, is a case growing out of an assault and battery inflicted upon the person of another, and is not authority for appellant's position. Nor is the only other case cited in support of that proposition (Railway v. Mackney, 83 Tex. 414, 18 S. W. 949) in point. A rule, such as contended for, would give too much power to reckless drivers, and be very dangerous to the safety of others upon our streets. It would qualify our traffic laws for public safety too much.

Appellant's assignments 15, 16, and 17 raise practically the same questions already discussed concerning the submission of the court's charges 7 and 8 and the court's refusal to give appellant's special charge No. 1, and for the reasons heretofore given they are all overruled.

The twelfth assignment of error complains that the verdict of $9,500 is excessive. We will not pass upon this assignment, as this case will have to be reversed and retried, and for the same reason we overrule the fourteenth assignment, complaining of prejudicial remarks of counsel for appellee made to the jury in the closing speech.

This now brings us to the consideration of the assignment No. 13. This assignment complains of the action of the trial judge

during the trial, and in the presence of the jury, in leaving the judge's seat while the physicians were measuring appellant to determine whether or not one of his legs was shorter than the other, directing how the physicians should do this work, and finally making the measurement himself, and in commenting thereon, all in the presence of the jury. There was a sharp conflict between the physicians called by appellant to testify and those called by the appellee to testify as to the injury and shortening of the leg. Dr. Frank Paschal, Sr., was called as a witness, and testified he had that day made a measurement of the man, and there was no difference in the length of the two legs, and stated he would be willing to make the examination of the man in the presence of the jury with Dr. Berry, which was accordingly done by agreement of counsel.

The bill of exception is as follows:

"Be it remembered that during the trial of the above entitled and numbered cause the following proceedings occurred, to wit:

"While plaintiff was making out his case in chief, both Dr. De La Llamo and Dr. Robert Lee Withers testified that plaintiff's left leg was shorter than his right leg, Dr. De La Llamo giving the shortage as one inch and Dr. Withers giving the shortage as 1½ inches, both of them explaining and illustrating to the jury just how they took said measurements of plaintiff's leg. Thereafterwards Dr. Frank Paschal, Sr., testified in rebuttal for defendant, and stated to the jury that several days before he thus testified in court he had carefully examined and measured both of plaintiff's legs, and that they were of exactly the same length.

"Thereupon counsel for defendant asked counsel for plaintiff, in open court, in the presence of the jury and of the court, whether plaintiff would consent that Dr. Paschal and Dr. D. Berry (who had examined plaintiff and measured the length of his two legs in conjunction with Dr. Withers, and who was then expected to testify in rebuttal for plaintiff herein) should examine plaintiff in the presence of the jury, in the courtroom, and determine whether or not his left leg was and is shorter than his right leg, and, if so, to what extent. Counsel for plaintiff agreed that such joint examination of plaintiff should be made by Drs. Paschal and Berry, and such examination was shortly thereafterwards made in the presence of the court and the jury. While said examination was in progress in the presence of the jury, and while plaintiff was lying on his back upon the table in the courtroom, and while said physicians were engaged in taking measurements upon the body of plaintiff with an ordinary tape measure, and after said Dr. Berry had called attention to the fact that the right hip of plaintiff seemed to be more elevated than the left hip, and after Dr. Paschal had stated that this fact was without significance, his honor, Hon. R. B. Minor, upon his own motion, stepped forward, and in the presence of the jury, while said examination by said physicians was in progress as aforesaid suggested that a measurement be taken directly across the abdomen of plaintiff, from hip to hip, and shortly thereafterwards, such

suggestion by the court not having been acted upon by either of said physicians, the examination of plaintiff being still in progress, his honor took the tape measure in his own hands and stretched it directly across plaintiff's abdomen from hip to hip, and the tape measure as thus placed by the court demonstrated apparently that the left hip of plaintiff was about an inch or so higher than the right hip, although said physicians then and there agreed in the presence of the jury that the two legs were of the same length, and his honor then stated in the presence of the jury that apparently the left hip of plaintiff was higher than his right hip.

"And be it remembered that in closing argument before the jury counsel for plaintiff commented upon the fact that it was made apparent to all present at the examination of plaintiff in the courtroom that plaintiff was injured, so much so that the court himself was able to, and did, take the tape measure and show the considerable difference between plaintiff's hips as aforesaid.

"Counsel for defendant took no exception at the time to the action of the court aforesaid, nor to the argument of counsel for plaintiff thereon."

The following indorsement was made on the bill:

"The foregoing bill of exceptions was presented to me on May 31, 1919, for allowance, and the same was presented to counsel for plaintiff, who refused to concur therein. I refuse to approve the same because I do not concur in the facts stated, and, moreover, no predicate was made for a bill of exceptions by any objection or exception.

"Done this 28th day of June, 1919. R. B. Minor, Judge 57th District Court of Bexar Co."

This bill was then proven up as a bystanders' bill by the affidavits of three jurors, one on the 12th day of August, 1917, and the others on the 27th day of August, 1919. The appellant very pointedly called the court's attention to this complaint against his action in this matter in the thirteenth ground of his motion for a new trial. The court's refusal of the bill is that—

"I do not concur in the facts stated, and, moreover, no predicate was made for a bill of exceptions by any objection or exception."

[13] If the matters are as stated, and three of the jurors have so sworn, and opposing counsel silent and offering no controverting affidavits so far as the record discloses, it was the duty of the court to have given the bill, with such qualifications as he desired. The bill was presented to him in time. It was not a good ground to refuse because he did not "concur in the facts stated," without stating those and requiring it to conform to the facts as he understood them. To have a proper bill of exceptions is such an absolute right that no litigant ought to be deprived of it by any such mere technicality. The appellate courts are entitled to have presented as nearly as possible the case as it was tried below, and nothing less than that will satisfy, for there is no other way to administer justice. Article 2063, R. S. (Vernon's Sayles'), requires bill to be presented to the judge for allowance and signature. Article 2064 requires the judge to submit it to the adverse party, and, if found correct, shall be signed by the judge; and article 2065, if judge find it incorrect, to suggest necessary corrections to be made, and when made sign and file with the clerk. Article 2066, on disagreement the judge is required to return the bill, with his refusal indorsed thereon, and shall make out and file with the clerk such a bill of exceptions as will, in his opinion, present the ruling of the court in that behalf as it actually occurred. Article 2067 provides:

"Should the party be dissatisfied with the bill of exceptions filed by the judge, * * * he may, upon procuring the signatures of three respectable bystanders, citizens of this state, attesting the correctness of the bill of exceptions as presented by him, have the same filed as part of the record of the cause."

Strictly speaking, this statute contemplated, before resort be made to bystanders, a bill should have been filed by the court as provided in article 2066 in case of disagreements. Our decisions have established the right to prove up by bystanders bills of exception refused in toto, where none are prepared in lieu thereof by the court, as directed by the statute to be filed. Rabb v. Goodrich & Son, 46 Tex. Civ. App. 541, 102 S. W. 910; Shook v. Shook, 145 S. W. 699.

Article 1607, R. S., also provides for a way in which to have Courts of Civil Appeals consider bills of exception not signed by the trial court.

Article 2067 provides the method of trial, as to the truth of the statements in the bill, to be controverted by affidavits. No issue was made by appellee below upon the truth of this bill, and it finds its way here uncontroverted except by the statement of the trial judge that he does "not concur in the facts stated." As there are several facts stated therein, we are left in ignorance as to those to which he has filed his dissent. The law makes it incumbent upon trial judges to agree upon a correct bill, and then, if it cannot be done, to prepare for himself and file one that suits him in lieu of the disputed bill. This bill was prepared and presented to the judge in ample time. Appellant was required to do this, and only upon the refusal of the judge to approve it could it resort to other methods available by law. This it did by securing three affidavits of bystanders, who were jurors engaged in the trial of the case, as hereinabove discussed, and said affidavits were filed August 29, 1919. The motion for new trial was overruled on the 31st day of May, 1919. Appellant was allowed 90 days from perfection of appeal in "which to prepare and file a statement of facts and bills of exception herein." The bill of exception was presented to the court on the 31st day of

May, and retained by him until the 28th day of June, 1919, plenty of time for the judge to agree with counsel or prepare another.

[14] Appellee insists that we should not consider the bill because not filed in time, because there is no proper affidavit, and because the bill was proven up by jurors, who in legal contemplation were not bystanders, within the meaning of the statute, and in support of that contention cites Glover v. Pfeuffer, 163 S. W. 984; Corpus Juris, vol. 4, p. 266, par. 1877; Shook v. Shook, 145 S. W. 699; Dehougne v. Tel. Co., 84 S. W. 1066; Kenedy Co. v. Tel. Co., 167 S. W. 1094; Jolley v. Brown, 191 S. w. 177; Railway v. Broom, 53 Tex. Civ. App. 78, 114 S, W. 655.

In all the cases cited, except the Glover Case, the main question decided arose out of the fact that the bill was not presented in time to the judge. That does not arise here, for it was presented to the judge in term time, and by him retained for about 27 days before it was refused, which was after the adjournment of court. The affidavits were filed with the bill, all within the 90 days allowed. The record was filed here on the 11th day of September, 1919. We, therefore, hold that the bill of exception was filed in time to be considered by this court. The law does not require an impossible thing. The bill was presented during term time. Appellant could not anticipate the court would hold the bill until court adjourned and then refuse. Therefore it was presented in time. Being refused in vacation, the court knew the effect of his order granting time in which to present for approval the statement of facts and bills of exception; the court for that purpose stood open. Article 2067, R. S., does not prescribe the time in which the bill may be filed when time is granted, that is otherwise regulated. The time granted in this case is controlled by article 2073, R. S., so that the bill of exception and its supporting affidavits were filed in time as the law provides in such cases. Here the statute authorizes the court to make the extension, and a bill filed within that period complies with the law as though filed during session of the court. In the Glover Case, supra, opinion by Chief Justice Fly of this court, after discussing bystander, quoting Webster's definition, said:

"Under no possible circumstances could the attorneys for either party be classed as 'bystanders.' In the case of State v. Jones, 102 Mo. 305, 14 S. W. 946, 15 S. W. 556, the matter in question was directly before the Supreme Court of Missouri, and it was held that an attorney in the case was not a 'bystander' in the contemplation of the law. The court said: 'The object of the statute in requiring the refused bill to be signed by three bystanders, respectable inhabitants, etc., was doubtless to obtain to such a bill the signatures of disinterested spectators, and not those whose interests are at war with such an attitude of indifference.' One of the attesting witnesses to the bills of exception in this case was the attorney for appellants, and another was the attorney of part of the appellants on a former appeal of this case. The bills cannot be considered, because not proved up by three bystanders."

[15] The signers of this affidavit were no more interested in the trial than the judge who signs all bills. The jury, in a sense, were bystanders; they were respectable inhabitants; and, unlike interested attorneys in the case, they had no interest in the result. We can hardly conceive of any bystander less interested. They were in a position to observe every detail of the proceedings, and sworn to try the case according to law. They were standing near. They were spectators. They had no concern with the business transacted; that is, with the action of the court in the particulars mentioned. They had no interest in his actions, except his rulings as judge of the court and to obey and follow his charge to them. They could not pass on the personal actions of the judge outside of his official duties. That was between the attorneys and the court. They could not pass on that; they were not sworn and charged for any such purpose; it involved a question of procedure and law upon which they could not be called on to pass. They had no concern with the business transaction, only as to what the court directed them to consider. No one can say what effect the action and statement of the trial judge had on the jury. He left his seat on the bench, and directed and caused a measurement to be made, and expressed an opinion as to certain facts concerning the injury. The facts stated in the bill of exceptions must be taken as true, and they show that the judge left his seat on the bench and directed and caused a measurement to be made, and expressed an opinion as to certain facts causing the injury. Our knowledge of the high personal character of the judge satisfies us that his acts upon the occasion in question resulted wholly from a failure to realize the effect that his efforts to satisfy himself might have upon the minds of the jurors. There is no doubt, however, in our minds that his acts, as set out in the bill of exceptions, in the measurement and commenting upon the effect thereof, as he understood it, in the presence of the jury, was highly prejudicial to the rights of appellant. If the judge had doubts as to the correct measurement, he certainly had the right to question the doctors in the hearing of the jury, and have their answers for the benefit of the jury. Or, if he preferred, himself, to engage in the measurement to satisfy his own mind, he should have sent the jury from the room. Remarks of the court and conduct of the judge in the presence of the jury, which intimate his view upon any question, are watched with the closest attention, and may be highly prejudicial. It was specially harmful and intensified, because counsel for appellee were permitted by the court to comment on his action in making the measurement and in reference thereto to say:

"It was made apparent to all present at the examination of plaintiff in the courtroom that plaintiff was injured, so much so, that the court himself was able to, and did, take the tape measure and show the considerable difference between plaintiff's hips as aforesaid."

The court should have of his own motion stopped counsel, and instructed the jury they were not to consider counsel's remarks in respect to the court's action in the matter, as to what he did or said, and could not be entertained by them as any fact submitted for consideration in arriving at their verdict. Too often attorneys, in their zeal and earnestness, without intending to do so, violate the rules of court and go far outside of the record, and say things they should not, which a watchful trial judge should be able to control without his attention being called thereto by an objection. It is, however, the proper practice for attorneys to make timely objections, and not, as attorneys for appellee contend, wait to hazard the result of the verdict of the jury, and, if unfavorable, then enter the complaint. The court will not then, as a rule, entertain such a tardy objection, unless it be in a very extreme case, coming within the rule laid down in which certain exceptions may be considered in the absence of an objection made at the time. The court will in such extreme cases consider improper remarks calculated to arouse a prejudice in the minds of the jury not possible to efface by any instructions not to consider them, though no exception be taken. The object in requiring these objections is to give the court the chance, by proper and firm action, to remedy the error and nullify the injury or mischief done. Railway v. Rehm, 36 Tex. Civ. App. 553, 82 S. W. 526; Railway v. Washington, 42 Tex. Civ. App. 380, 92 S. W. 1054; Prather v. McClelland, 26 S. W. 657; Willis v. McNeill, 57 Tex. 465; and many other cases to the same effect. Suppose an objection had been made at the time to the action of the court in leaving the bench to engage in the measurement of the man's anatomy, also to the remarks made by him at the time, as well as to the remarks of counsel in referring to it. No instruction to the jury not to consider what he did and said could remove from their minds the picture of the scene enacted in their very presence and before their very eyes. The damage had been done, and the transaction photographed upon their minds beyond the power of the court to efface. Counsel representing appellee are among the ablest lawyers in the state. They were quick to see their advantage and opportunity to make, as they did, the most of it in their argument, as set out in the bill. This is a case that calls for a decision of this court, whether the objection was made or the exception taken at the time, just as it is held the court may do in cases where arguments of a hurtful nature are made, though not excepted to at the time, impossible to efface be-

cause of its hurtful nature, just as the remarks of the court giving his opinion falls within the prohibition against commenting on the weight of evidence. Railway v. Gilliam, 166 S. W. 706; Tex. Co. v. Rose, 103 S. W. 445. We are basing this upon the proposition that the nature of the harm done was of such a character that, had an objection been made, no action of the court or instruction given could have removed the harm done or have cured the injury. Neill v. Rogers Bros. Produce Co., 38 W. Va. 228, 18 S. E. 564; Kramer v. N. W. Elevator Co., 91 Minn. 346, 98 N. W. 97. The court had the opportunity to correct the error, when appellant presented the motion for new trial embracing this very objection. Kramer v. N. W. Elevator Co., supra.

For the reasons given, the thirteenth assignment of error, complaining of the action of the court, is sustained.

The judgment is therefore reversed, and the cause remanded for a new trial.

### On Motion for Rehearing.

MOURSUND, J. [16] It is true, as contended by appellee, that our holding with reference to the time in which a bystanders' bill of exceptions may be filed is not in accord with expressions contained in some recent opinions, as well as those rendered under different statutes. In view of this fact, we deem it proper to further discuss the question, in order that the reasons upon which we base our decision may be fully understood. We will also touch upon some of the other contentions pressed in the motion for rehearing.

Sections 101, 102, and 103 of the Practice Act of 1846 (Gammel's Laws, vol. 2, p. 1697), in prescribing the method of obtaining a bill of exceptions, failed to include any provision with respect to the time in which the bill would have to be presented and filed. In the case of Houston v. Jones, 4 Tex. 170, it was held that a bystanders' bill of exceptions should have been given at the time of the occurrence of the facts certified to, and used a general statement that all exceptions to the opinion of the judge should be reduced to writing at the time the opinion is given on the ruling made. In Jones v. Thurmond's Heirs, 5 Tex. 318, it was held that a bill of exceptions ought to be tendered at the trial, or at as early a period as practicable, and during the term. This decision indicates that the court found no rule or statute to guide it, as it discussed the rules applied by courts of other states. In the case of Heidenheimer v. Thomas, 63 Tex. 287, the court held that it was requisite for a bystanders' bill to show that the persons who signed it were present when the facts in dispute occurred, and that the certificate was given at the time the occurrence to which it relates transpired, citing Houston v. Jones, supra. This decision was rendered after the adoption of the Revised Statutes of

1879, in which the language relating to bills of exception had been changed from that of the act of 1846, and by article 1363 it had been provided that it should be the duty of the party taking any bill of exceptions to reduce the same to writing, and present it to the judge for his allowance and signature during the term, and within 10 days after the conclusion of the trial. We have been unable to ascertain whether the change made by virtue of article 1363 had been made by the Legislature previous to the adoption of the statutes of 1879, or whether it was written into the statutes by the codifiers. Their report contains no reference thereto. Such provision was carried forward in the revision of 1895, but since then various acts have been passed, increasing the time within which bills of exception must be filed. See Gammel's Laws vol. 12, p. 32; vol. 13, p. 446; vol. 14, p. 376; vol. 15, p. 266. These acts all contain captions describing them as acts to prescribe the time, or amending acts to prescribe the time, within which bills of exception may be filed. In a case decided February 4, 1905, the Dallas Court of Civil Appeals held that a bystanders' bill must be taken and filed at the time of the occurrence of the acts complained of. De Hougne v. Tel. Co., 84 S. W. 1066. That court repeated the holding in Shook v. Shook, 145 S. W. 699. This court held the same in Kenedy v. Tel. Co., 167 S. W. 1094. The Amarillo court, in Jolley v. Brown, 191 S. W. 177, used language indicating that it held the same views with respect to the time for taking such a bill of exceptions. In view of the opinions thus expressed, it may seem presumption indeed for this court to announce a different view, and ordinarily we would be very reluctant to do so. We are led to do so by our conviction that the Legislature, in prescribing in general terms the time for filing bills of exception, did not intend to lay a trap for the unwary, but intended to obviate, not only the necessity for delaying the trial to draw up bills of exception, but also other trials in which the court might wish to engage during the term. If it be true that a bystanders' bill is not worth the paper it is written on unless taken and approved at the time of the occurrence of the facts complained of, the attorney who avails himself of the statutory time to draw up his bill must take the responsibility of jeopardizing the interests of his client. He cannot know that the court will disagree with him until he presents his bill, and unless he presents it at once he has no remedy upon the occurrence of the disagreement. While we do not regard the Supreme Court decisions above referred to as authoritative under the present statutes, we will also call attention to the fact that in not a single case hereinbefore named was it necessary to decide that a bystanders' bill must be taken, approved, and filed at the time the acts complained of occurred. In each instance one or more other objections were shown, sufficient in themselves to destroy the bill.

[17] The holding that jurors are bystanders within the meaning of the statute relating to bystanders' bills of exception at first glance may seem to be at variance with the definition of the word "bystander," and it may also be argued with much force that as a bill of exceptions may be taken during the course of the trial, if jurors be drawn into the controversy, it may affect their verdict. We do not think, however, that the fact that the jurors might not be availed of at the particular time because of danger of transgressing other rules of practice would place them in the same class with the lawyers trying the case and the parties. This court had occasion in the case of Glover v. Pfeuffer, 163 S. W. 984, to pass upon the question whether the attorneys could certify a bystanders' bill, and we quoted with approval from the Missouri case of State v. Jones, 102 Mo. 305, 14 S. W. 946, 15 S. W. 556. We find that the Supreme Court of Missouri (Division 2) in the case of Buck v. St. Louis Union Trust Co., 267 Mo. 644, 185 S. W. 208, held that a bystanders' bill could be attested by jurors who had assisted in the trial of the case, and the reasons for so holding appeal to us as sufficient to warrant us in adhering to our conclusion that the objection urged in this case to the effect that jurors cannot be bystanders within the meaning of the law should be held to be without merit.

[18] Statutes relating to appeals are always liberally construed; and this court has heretofore followed that rule of construction with reference to statutes relating to filing bills of exception. Railway v. Vick, 210 S. W. 247; General Bonding & Casualty Ins. Co. v. McCurdy, 183 S. W. 796.

[19] It is contended that—

"Where no objection has been made, no bill of exceptions is authorized by our statutes, and it would therefore be impossible to take out a written bill of exceptions where the party failed to except or object to the action of the court."

This contention is plausibly argued, but is not in accord with the opinions of our courts, which have treated the bill of exceptions as the means for making a part of the record on appeal all matters not shown by the record proper or the statement of facts. In the case of Willis & Bro. v. McNeill, 57 Tex. 465, the court held that argument of counsel constituted error, and in order to arrive at such conclusion considered a bill of exceptions, copied in the statement of the case, which disclosed that no objection was made at the time the argument occurred. The bill of exceptions did not disclose any request to

the court to instruct the jury concerning the argument, and hence no exception to any ruling of the court. The opinion appears to have been based largely upon the fact that under the rules the duty rests upon the judge to confine counsel to proper argument. This holding has been followed in other cases. Railway v. Rehm, 36 Tex. Civ. App. 553, 82 S. W. 526, and cases therein cited. Surely the duty resting upon the court not to comment upon the weight of the evidence by word or act is fully as important as that of confining argument to proper bounds.

[20] The bill of exceptions attested by the three jurors as bystanders shows words and acts upon the part of the court which impressed upon the minds of the jury the fact that one hip was higher than the other, and must have led them to believe that such fact was of great importance in the trial of the case. It also disclosed that the acts and words of the court were commented upon in argument by counsel for plaintiff, at which time it certainly became the duty of the court to stop such argument and instruct the jury not to consider such argument or his acts and words.

[21] The fact that the evidence is undisputed to the effect that one hip was higher than the other is not sufficient ground for holding the court's actions and words to be harmless, for there seems to have been a sharp issue as to the extent of the injuries, and it was alleged by plaintiff that his hip was injured, and, according to the bill of exceptions, argued by counsel, in effect, that the difference in the hips, as disclosed by the court's measurement, was the result of the injuries. The act of the court in lending weight and importance to undisputed evidence, when that evidence will probably be viewed as having an important bearing in showing that injury resulted from the alleged negligent act, is certainly prejudicial. The verdict was for $9,500, and is attacked as excessive. We regard it as high, and would not be authorized to assume that the words and acts of the court had no effect in arriving at such amount.

[22] Our courts have not taken the view in cases of improper argument that it was incumbent upon the other party to ask leave to withdraw the case from the jury and continue it, or else be estopped from complaining of such argument. No such rule has been applied by our courts, we believe, except as to proceeding with a trial when a juror is discovered during the trial to be disqualified. Our attention has not been called to any case in which it has been applied with respect to errors committed by the court or objectionable argument. If the error is one, the effect of which could have been obviated by the interposition of objection and request for instruction, the failure to take such steps will preclude taking advantage of the error, but when the error is of such character that its injurious effect cannot be removed the courts will not require the doing of a futile act.

[23] The trial court declined to approve the bill of exceptions upon two grounds: First, because he did not concur in the facts stated; and, second, because there had been no objection or exception, and he therefore believed that no predicate was laid. Had there been only the first ground, it is clear that it became his duty to file a bill of exceptions showing the facts as he recollected them. There can be no doubt that something occurred upon which the affidavits of the jurors were based; and, if the principal facts or details were incorrectly stated, the true facts, as recollected by the court, should have been stated. We do not regard the second objection as being a conclusive answer to a demand for a bill of exceptions, as is hereinbefore disclosed. The fact that no exception was taken was disclosed by the bill, and could have been made as positive as desired by qualifying the bill, or stating it in such bill as the court might deem to correctly state the facts. The appellee would not have been deprived of any legal right by so doing, for if the failure to object rendered the bill defective, it would not support an assignment of error in the appellate courts.

When the bystanders' bill was filed, the appellee did not avail himself of his statutory right to show by affidavits wherein the bill was incorrect, but elected to depend upon what he regarded to be defects rendering the bill a nullity. This course may have placed the facts before this court in a light which is unjust to the trial court, but we must take the record as we find it, and believing that there has been such a compliance with the law as makes the bill a valid part of the record, and that it shows prejudicial error, we conclude there was no error in our judgment reversing the judgment of the trial court, and that the motion for rehearing should be overruled.